In the matter of the petition of the NEW JERSEY STATE BAR ASSOCIATION for an investigation in the court of chancery.

[Argued May 26th, 1933. Decided October 23d, 1933.]

*Mr. J. Emil Walscheid,* for the petitioner-appellant.

*Mr. Shelton Pitney* and *Mr. Alexander T. Schenck,* for the master-respondent.

*Mr. James D. Carpenter* and *Mr. Josiah Stryker,* for the New Jersey State Bar Association.

The opinion of the court was delivered by

BODINE, J.

In the spring of 1932, discovery was made that a certain equity receiver had embezzled a large sum of money entrusted

to his care by the court of chancery. It had long been apparent that certain of the officers of the court lacked in public confidence. Certain favored appointees were rewarded with a lavish hand and private property rights were not uniformly safeguarded. Judicial proprieties, to say the least, were often disregarded, as well as the inherent rights of litigants, witnesses and counsel. The State Bar Association petitioned the late chancellor for the appointment of a master to investigate the court. The Honorable Charles L. Carrick was appointed master with power to conduct an investigation into the practices which existed on the part of members of the bar in soliciting receivership cases and the handling thereof; also in the administration of receivership and other trust estates in the past and present, including the fees allowed and paid to receivers, solicitors for and counsel with receivers and other trustees, auctioneers, appraisers, accountants, masters and any other officers of the court; including fees paid to officers or attorneys in the administration of the affairs of closed banks and other financial institutions, and whether or not any fees allowed to any of such officers have been split, and with whom, and whether any officer of the court had benefited directly or indirectly in the fees allowed any other officers or appointees of the court.

The master so chosen displayed commendable zeal and immediately proceeded to conduct hearings, first, in private and then in public. He was assisted by very astute and industrious counsel. Their work has most fortunately resulted in a much better understanding of the proper function of the judicial office and a better administration of insolvent estates. The study which they have made has resulted in desirable administrative changes.

The appellant presents for our determination the question of whether the master so appointed may publicly inquire into the judicial acts and private business affairs of a vice-chancellor. The order entered by Chancellor Walker so directed. The appellant when affected by the order sought relief by petition for a stay. This relief was denied.

The court of chancery has come down to us as the counter-

part of the British court of chancery. The chancellor is the court of chancery. However, since the judicial work could not be performed by one man, the legislature from time to time provided for the appointment of vice-chancellors. The vice-chancellors are judicial officers of the state and hold positions of great public responsibility. Some of our ablest equity judges have held the office and their opinions are prized by leaders of the bench and bar in this and other jurisdictions. Many of these judges have had long and honorable careers. They are chosen by the chancellor, but like the chancellor hold the state's commission under the great seal. Cases are referred to them by general or specific rule, and upon their advice the chancellor's name is placed, as a matter of routine, upon orders and decrees he neither sees nor reviews. For convenience, the state is divided into districts and vice-chancellors assigned to a particular district have sole jurisdiction therein. It is perfectly true that the vice-chancellor functions as a master of the court, but by law, custom and usage he is regarded as a judicial officer of the state. That his decisions may be reviewed by the chancellor in no sense lessens his independence. The legislature has created the office, fixed the term and the emoluments. The constitution vests in the legislature the sole power to impeach a civil officer of the government. Because the chancellor may revoke or withhold references to a vice-chancellor gives him no power to remove a duly commissioned officer of the state. No chancellor has asserted such power. Removal of civil officers of the government is confided to the legislative branch of the government. The legislature, when the office of vice-chancellor was first created, no doubt felt that the selection of a vice-chancellor by the chancellor would insure the choice of incumbents of the highest character and learning, and the result, for the most part, has justified this expectation.

That the office of vice-chancellor is a civil office under the government of the state cannot be doubted. By amendment to the *Habeas Corpus* act the power was conferred upon vice-chancellors to issue writs and hear and determine the same. *P. L. 1889 p. 426; 2 Comp. Stat. p. 2640.*

Mr. Justice Dixon, for this court, said in *Buckley* v. *Perrine, 55 N. J. Eq. 514,* that the power was the same power conferred upon law judges. Certainly the legislature could not confer the power to issue prerogative writs upon one not a civil officer of the government. Nor does it make any difference that the vice-chancellors could derive their powers to issue writs and injunctions by delegation from the chancellor without legislative aid. *In re Thompson, 85 N. J. Eq. 221, 258.* The legislature in creating the office of vice-chancellor no more deprived the chancellor of his powers than they deprived the supreme court of its powers when provision was made for the trial of supreme court issues by reference to a circuit judge. *2 Comp. Stat. p. 1712.* The delegation to other officers of the government was essential for the preservation of the courts and legislative aid was sought. Without the office of vice-chancellor the court of chancery could not function. The vice-chancellor is far more than the *alter ego* of the chancellor. He is the judicial officer of the state to whom the equity powers of the court of chancery have been delegated with legislative approval. That he is not merely a master of the court is conceded by all. That his powers arise by delegation cannot be disputed. *Morton* v. *Beach, 56 N. J. Eq. 791.* But since he holds a civil office under the government, he is subject to impeachment and not judicial inquisition at the instance of other civil officers of the government.

The chancellor has no power to deprive the holder of the state's commission of his office. *In re Hahn, 85 N. J. Eq. 510.* It is equally obvious that if the inquisition into the public and private acts of a vice-chancellor be continued a judicial officer, duly commissioned, may suffer irreparable injury. No officer of the government is subject to judicial inquisition as to his public and private acts except in the forum created by the constitution. Any usurpation by the chancellor of a non-existent power gives rise to a right of appeal by those presently affected; otherwise the usurpation would go uncorrected and a judicial officer, the subject of an unlawful inquisition, would be deprived of his constitutional right to meet charges as and when made in the manner fixed by the organic law.

It would not be contended for one moment that the court of chancery could inquire into the public or private acts of judicial officers other than vice-chancellors. Such officials may be impeached for misconduct, but they are not subject to judicial inquisition by the chancellor and no such jurisdiction has been previously asserted. The chancellor may, of course, inquire into abuses which arise by reason of dishonest or faulty practice in chancery, so far as the inquiry relates to acts by those who may be removed or disciplined. Informally he might, of course, inquire into the character and fitness of persons whom he might be called upon to appoint or to reappoint to judicial office, but the judicial officers of the court when appointed are no more subject to a public judicial inquisition by the appointee of the chancellor than he would be by the appointee of one of the vice-chancellors. Like the chancellor, and other judicial officers of the state, the vice-chancellors may be impeached, but their official acts, except in the case of a review by the chancellor, or on appeal, are not subject to other judicial inquiry. From the earliest times, judicial officers in England and America have been free from prosecution for their official acts except in the legislative forum. The reason is because it was early recognized that a judicial officer must be free to form his own judgments. In the performance of his duties, his conscience and knowledge of the law alone must control. To subject a judge to a judicial inquiry as to his official acts would deprive him of the ability to make a free and unfettered judgment. If a judicial officer is unfit, the representatives of the people may be depended upon to deal with the matter. The prerogatives of the legislature may not be trespassed upon.

Mere fishing excursions never have been favored by the law. If official acts be of such a kind as to warrant impeachment the penalty is certain. But before charges are made in a proper tribunal, a judicial officer cannot be subjected to a public inquiry into matters and things affecting his fitness for office. Any other rule would result in the impairment of the independence of the judiciary.

It is not for one moment to be supposed that the chancellor

may not make rules which would control the administration of cases in chancery. But he has not the power to subject independent judicial officers of the court to public inquiry as to their official acts or private conduct. The vice-chancellors are answerable to the representatives of the people.

We, therefore, conclude that the investigation cannot directly reach into the acts of the vice-chancellors while in office. In theory and in practice they derive their power from appointment to an office created by an act of the legislature. The reference from the chancellor to hear and determine follows as of course. The acts of the vice-chancellors are not the acts of the chancellor except in this, that he is the fount of equity jurisdiction and their acts are, therefore, done in his name. This circumstance cannot be used for the purpose of hampering the independence of the judiciary and rendering the vice-chancellors of the state subject to a proceeding never before contemplated under our constitution. The proceeding, to this extent, is not only beyond the power of the chancellor but is anomalous to say the least. Otherwise it would appear that a judicial officer may be subjected to a public inquiry as to his official and personal acts by a master of his court whose report, made a matter of public record, can contain no recommendation or have other legal effect. Upon the report coming in the chancellor, it is conceded, is powerless to suspend or remove an official who may be discredited in the eyes of the public. The official, since he is not impeached, may apparently remain in office until he resigns. It is, therefore, apparent that by the proceeding the chancellor cannot purge the court, and it is also apparent that the action would deprive a duly commissioned judicial officer ·of a trial in the only forum that can effectively and legally deal with the question of his right to exercise the powers of the office to which he was appointed.

The inquiry into the acts of the vice-chancellors of the court of chancery, though well within the four corners of the order made by the former chancellor, was improvidently included therein. The order appealed from is, therefore, reversed to that extent.

*For affirmance*—None.

*For reversal*—The Chief-Justice, Trenchard, Parker, Case, Bodine, Donges, Heher, Perskie, Van Buskirk, Kays, Hetfield, Dear, Dill, JJ.   13.