187 N.J. Super. 264 (1982)
454 A.2d 449
STATE OF NEW JERSEY, PLAINTIFF,
v.
WILLIAM V. MUSTO, NEW JERSEY STATE SENATE, CITY OF UNION CITY, BOARD OF COMMISSIONERS OF THE CITY OF UNION CITY, DEFENDANTS. WILLIAM V. MUSTO, SENATOR FROM THE 33RD DISTRICT, STATE OF NEW JERSEY, PLAINTIFF,
v.
CARMEN A. ORECHIO, PRESIDENT OF THE NEW JERSEY SENATE, AND THE NEW JERSEY STATE SENATE, DEFENDANTS.
Superior Court of New Jersey, Law Division Hudson County.
Decided June 16, 1982.
*268 Eugene J. Sullivan for plaintiff State of New Jersey (Irwin I. Kimmelman, Attorney General of New Jersey, attorney).
Leon J. Sokol for defendant New Jersey State Senate (Greenstone & Sokol, attorneys).
*269 Thomas A. DeClemente for William V. Musto (DeClemente & Klitzner, attorneys).
Joseph W. Farrell for Union City Housing Authority.
George J. Kaplan for Board of Commissioners of the Union City.
O'BRIEN, A.J.S.C.
William V. Musto is a member of the New Jersey State Senate, having been re-elected to that office on November 3, 1981. On January 10, 1982 he was sworn in for his present term, which will expire on January 12, 1984. He is also a member of the Board of Commissioners of Union City and its mayor. His present term as commissioner and mayor expires on June 30, 1982. He was re-elected to the Board of Commissioners on May 11, 1982 to a term which commences on July 1, 1982.
On April 27, 1981 an indictment returned by the United States grand jury was filed in the United States District Court for the District of New Jersey containing 46 counts charging defendant with various federal offenses in 34 counts thereof. On March 26, 1982, following a lengthy trial on the indictment, Musto was found guilty on 28 counts and not guilty on six.
On May 10, 1982 a judge of the United States District Court imposed sentence upon Musto on those charges in the indictment for which he had been found guilty. That sentence has been stayed pending appeal. This court expresses no view concerning the merits of that appeal. For purposes of this case he stands convicted regardless of the outlook for his appeal.
On May 11, 1982 the Attorney General of the State of New Jersey, pursuant to N.J.S.A. 2C:51-2(a), instituted suit on behalf of the State seeking a judgment declaring that Musto had forfeited his public offices as senator and as member of the Board of Commissioners of the City of Union City and mayor, by reason of his convictions in the United States District Court.
*270 On May 13, 1982 Musto filed suit as senator from the 33rd District against the New Jersey State Senate and Carmen A. Orechio, president thereof, seeking to restrain the operation of N.J.S.A. 2C:51-2(a) and (b) and to stay the New Jersey Senate from issuing a writ of election pursuant to N.J.Const. (1947), Art. IV,  IV, par. 1 and N.J.S.A. 19:3-28, as amended by L. 1981, c. 429. This court denied the application for preliminary relief. That denial was affirmed by the Appellate Division on May 14, 1982 and by the Supreme Court on May 17, 1982.
By resolution of the New Jersey Senate duly adopted on May 17, 1982, the president of the Senate was authorized and directed to issue a writ of election. On that date defendant Carmen A. Orechio, as president of the Senate, issued such writ of election and proclamation
... directing that an election be held according to the laws of the State of New Jersey in Legislative District 33 on June 23, 1982 for the purpose of electing a member of the Senate for Legislative District 33 to fill the vacancy caused by the forfeiture of office by William V. Musto as a member of the Senate and that the candidates for this office to be voted upon at the election be selected or nominated in the manner provided by law."
The declaratory judgment suit of the Attorney General has been dismissed as to the State Senate. The Attorney General has intervened in the suit by Musto against the Senate and its president. On May 28, 1982 the Attorney General amended the original complaint seeking, pursuant to N.J.S.A. 2C:51-2(c), to preclude Musto from assuming the office of Commissioner of Union City to which he was elected on May 11, 1982. The court has consolidated the two actions on its own motion.
The relief sought by William V. Musto as plaintiff, as well as his defense to the declaratory judgment sought by the Attorney General, is twofold: (1) the statute is not applicable to him and (2) if applicable, it is unconstitutional. Since he is both a plaintiff and a defendant, he will be referred to hereinafter as "Musto." If he is incorrect, then the statute in question is self-executing. The forfeitures would result as a matter of law so that it would appear that there would be no need for a declaratory judgment from the court on that issue, as sought by *271 the Attorney General. However, the suit by Musto only deals with the office of senator, and the court will take judicial notice that Musto has continued to physically occupy and proclaim his role as commissioner and mayor of the City of Union City. Therefore, it appears necessary for the court to address the issue as articulated by the Attorney General in his complaint for declaratory judgment.

I. Applicability of the Statute

N.J.S.A. 2C:51-2, "Forfeiture of Public Office," provides in part as follows:
a. A person holding any public office, position, or employment, elective or appointive, under the government of this State or any agency or political subdivision thereof, who is convicted of an offense shall forfeit such office or position if:
(1) He is convicted under the laws of this State of an offense involving dishonesty or of a crime of the third degree or above or under the laws of another State or of the United States of an offense or a crime which, if committed in this State, would be such an offense or crime;
(2) He is convicted of an offense involving or touching such office, position or employment; or
(3) The Constitution or a statute other than the code so provides.
b. The forfeiture set forth in subsection a. shall take effect:
(1) Upon finding of guilt by the trier of fact or a plea of guilty, if the court so orders; or
(2) Upon sentencing unless the court for good cause shown, orders a stay of such forfeiture. If the conviction be reversed, he shall be restored, if feasible, to his office, position or employment with all the rights, emoluments and salary thereof from the date of forfeiture.
c. In addition to the punishment prescribed for the offense, and the forfeiture set forth in 2C:51-2a., any person convicted of an offense involving or touching on his public office, position or employment shall be forever disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions.
The first issue presented is whether the offenses of which Musto was convicted in the United States District Court are "an offense or crime which, if committed in this State, would be such an offense or crime," i.e., an offense involving dishonesty or a crime of the third degree or above, or "an offense involving or touching such office, position or employment."
The following is a list of the crimes of which Musto was convicted:

*272 1. Conspiracy (to participate in the affairs of an enterprise through a pattern of racketeering, which included bribery, mail and wire fraud, and extortion under color of official right) in violation of 18 U.S.C.A.  1962(d).
2. A violation of the Racketeer Influenced and Corrupt Organizations Statute, 18 U.S.C.A.  1962(c), the so-called RICO statute. This is the substantive offense that was the object of the conspiracy.
3. Fifteen counts of mail fraud, in violation of 18 U.S.C.A.  1341.
4. Five counts of wire fraud, in violation of 18 U.S.C.A.  1343.
5. Three counts of extortion and attempted extortion under color of official office, in violation of 18 U.S.C.A.  1951.
6. One count of a violation of the Travel Act, 18 U.S.C.A.  1952 (travel in interstate commerce to promote and further a bribery scheme), and
7. Two counts of falsely subscribing to the content of federal income tax returns, in violation of 26 U.S.C.A.  7206(1).
At issue in this litigation is the effect of a federal conviction on the applicability of the forfeiture statute of New Jersey. This issue has been considered by courts of various jurisdictions throughout the United States on a number of occasions. Mysteriously, Musto contends that the forfeiture provision has no application to him, without presenting any law in support of that position. Despite his unsupported contentions, the available case law indicates that
... The issue certainly is not new. The majority of jurisdictions which have addressed the issue hold that a "conviction" of a felony under federal law disqualifies a person from voting or holding public office in the State although he has not been "convicted" in the State system.
The case quoted, State ex inf. Peach v. Goins, 575 S.W.2d 175, 180 (Mo.Sup.Ct. 1978), was an action seeking a declaration that the city sheriff had forfeited his office because he had been found guilty of felony offenses against the United States, although he had not been convicted under the state law. Similarly, in People ex rel. Ryan v. Coles, 64 Ill. App.3d 807, 21 Ill.Dec. 543, 381 N.E.2d 990 1978), the question presented to the court was whether a public official who had been convicted of extortion, in violation of 18 U.S.C.A.  1951, was eligible to hold the office of township supervisor.
In both of these cases the courts decided that the federal conviction triggered the operation of their state forfeiture statutes. Both courts chose to look beyond a cursory analysis of the *273 elements of the federal crimes as compared with the state counterpart. For example, the court in Coles looked to the "essence" or "gist" of the federal crimes in determining whether they would have also been crimes under the state system. The court held:
... Since Coles accepted money which was tendered in order to influence his official acts as liquor commissioner, the `gist' of the offenses which led to his conviction under 18 U.S.C.  951 would have constituted bribery under the Criminal Code of Illinois. [64 Ill. App.3d 807, 21 Ill.Dec. at 548, 381 N.E.2d at 995]
In Goins, supra, the court stated:
... It is sufficient, under the authorities, for disqualification from public office to have been found guilty of felony offenses under federal laws as long as those offenses would be felonies if committed in this State. [at 180]
The Oklahoma Supreme Court, in Hughes v. Oklahoma State Election Board, 413 P.2d 543 (Okl.Sup.Ct. 1966), searched for the "gravamen" of the federal charge in its determination of whether a federal conviction of embezzlement of postal funds constituted a felony under the state statutes. The court found that:
... The gravamen of the federal charge on which the petitioner was convicted was embezzlement and embezzlement constitutes a felony in Oklahoma. We therefore hold that the embezzlement of property belonging to the United States Government, when embezzled in the State of Oklahoma, is an offense against the State and constitutes a crime as prescribed by our State statutes. [at 548]
In light of these decisions, it is apparent that a comparison of federal offenses with state statutory offenses must proceed beyond an element-by-element breakdown. Paramount importance must be placed upon a determination of the "essence" or "gist" of the federal conviction. This court would be remiss in concluding that the forfeiture statute was inapplicable merely because the elements of the federal crime did not exactly correspond to the elements of the state crime. Therefore, it will adhere to the theory expounded by the Coles and Goins decisions, which apply the forfeiture provision if the "gist" or "essence" of the federal crime is an offense under state law. Of course, the additional requirements of dishonesty and an offense which involves or touches public office, which are peculiar to this State, will also be considered.
*274 Discrepancies between federal crimes and state crimes are often due to the language in the federal law involving interstate commerce. All references to the elements of obstruction of interstate commerce and the like should be separated from the other elements of the crime for purposes of comparison. The decisions previously mentioned imply that this type of jurisdictional element does not affect the determination that a federal crime can also be considered criminal under state law. A convicted felon is not being punished for using the mails or telephones in the commission of crime, but rather is punished for the underlying fraudulent act. Therefore, the underlying element of a federal crime overrides the jurisdictional element in importance in a determination of the applicability of the State forfeiture statute. The absence of a jurisdictional element in a state statute does not mean that the federal offense is not also a state crime.
In summary, the courts in other jurisdictions have provided support for the position that the forfeiture statute will be applicable to this litigation if it can be shown that (1) the "gist" or "essence" of the federal crime would constitute a crime or offense under state statutes, (2) the crime is an offense involving dishonesty or is a crime of the third degree or better, or (3) is an offense which involves or touches the public office. Based upon this format, it is clear that the crimes for which Musto was convicted would also be considered as criminal in New Jersey.
Counts one and two of the indictment upon which Musto was convicted involve a violation of the RICO statute (18 U.S.C.A.  1962(c)) as the substantive offense and conspiracy to violate that statute.
A review of the New Jersey Code of Criminal Justice, N.J.S.A. 2C:1-1 et seq., reveals that no comparable RICO statute exists in New Jersey. However, the violation of the RICO statute consists of an involvement "in the conduct of an enterprise's affairs through a pattern of racketeering activity...." Therefore, *275 it appears that the "gist" or underlying element in a violation of this statute is the involvement with racketeering activity. The indictment defines acts of racketeering here to include mail fraud (18 U.S.C.A.  1341), wire fraud (18 U.S.C.A.  1343), extortion (18 U.S.C.A.  1951), interstate travel to promote bribery (18 U.S.C.A.  1952), and bribery (under New Jersey statutes 2A:93-6 and 2C:27-2). Although there is no New Jersey RICO statute, the underlying elements of this statute, i.e., bribery and extortion, are crimes in New Jersey.
Bribery and extortion under the New Jersey statutes are the nexus between Musto and the enterprise and formed a part of the pattern of racketeering. Clearly the gist, or underlying elements, of the federal crime of which Musto was convicted under count two of the indictment were bribery and extortion, specifically under New Jersey law, which are third degree crimes as discussed infra.
It is well settled that where the intent to defraud is an essential element of a crime, that crime is one of moral turpitude. Jordan v. DeGeorge, 341 U.S. 223, 227, 71 S.Ct. 703, 705, 95 L.Ed. 886 (1950); O'Halloran v. DeCarlo, 156 N.J. Super. 249 (Law Div. 1978), aff'd 162 N.J. Super. 174 (App.Div., 1978). Prior to the current language of the forfeiture statute, which states that the offense or crime must be an offense "involving dishonesty," its predecessor, N.J.S.A. 2A:135-9, provided that the crime must involve "moral turpitude." The change from "moral turpitude" to "dishonesty" appears to be a broadening of the language of the statute. Therefore, crimes involving the intent to defraud would be considered as offenses involving dishonesty.
The crimes of extortion and bribery are clearly crimes which involve dishonesty. Inasmuch as dishonesty is a distinct feature of bribery and extortion, the statutory language provides that it is unnecessary to prove that these offenses are graded as crimes of the third degree or above and involve or touch defendant's public office. Despite the fact that these elements which trigger the forfeiture statute are in the alternative, this court is *276 satisfied by a review of the facts and the applicable statutes that each of the elements outlined in N.J.S.A. 2C:51-2(a) have been met with respect to the crimes of bribery and extortion, as they form the basis for the RICO conviction.
The conspiracy for which Musto was convicted was a conspiracy in furtherance of a violation of the RICO statute. Since a violation of the RICO statute is considered a crime under the New Jersey statutes defining bribery and extortion, a conspiracy in furtherance of that illegal act would also be considered criminal under the state conspiracy statutes, N.J.S.A. 2A:98-1 and 2C:5-2. This is especially true when one considers the similarity between the federal conspiracy statute and the state conspiracy statutes.
The acts of conspiracy of which Musto was convicted occurred from about July 9, 1974 to September 15, 1980. Due to the length of time during which these acts transpired, both N.J.S.A. 2A:98-1 and 2C:5-2 are applicable. Each of these statutes bears a close relationship to the federal conspiracy statute in language and essence. The federal statute states:
... if two or more persons conspire either to commit any offense against the United States, or to defraud the United States, ... [18 U.S.C.A.  371]
Similarly, N.J.S.A. 2C:5-2 provides:
A person is guilty of conspiracy ... to commit a crime if with the purpose of promoting or facilitating its commission he: (1) Agrees with such person ... that they will engage in conduct which constitutes such crime....
Preceding N.J.S.A. 2C:5-2 was the language of N.J.S.A. 2A:98-1, which defined the crime of conspiracy as any 2 or more persons who conspire (a) to commit a crime...."
A comparison of the elements of conspiracy on both the state and federal level show that the "essence of the crime of conspiracy is the unlawful agreement between the parties to commit an offense...." (jury charges of Judge Sarokin, U.S.D.C.). In State v. LaFera, 35 N.J. 75, 86 (1961), rev'd on other grounds, 42 N.J. 97 (1964), the court held that "The gist of the offense is the criminal agreement." As a result, it appears that the underlying element of this crime is the same in both forums, and a *277 federal conspiracy to violate the RICO statute would also be a crime of conspiracy under New Jersey law.
Musto was also convicted of the federal crimes of mail fraud (18 U.S.C.A.  1341) and wire fraud (18 U.S.C.A.  1343). A discussion of the elements of these crimes demonstrates that it is the underlying elements of a crime, and not the specific elements thereof, which are important to a determination of whether a federal crime would also be a crime or offense under New Jersey law.
The mail fraud statute, 18 U.S.C.A.  1341, states:
Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses ... for the purpose of executing such scheme or artifice or attempting so to do, places in any post office ... or knowingly causes to be delivered by mail ... shall be guilty ...
The wire fraud statute, 18 U.S.C.A.  1343, reads in a similar manner with the exception that reference is made to a different medium of communication.
Of course, there exists no comparable mail or wire fraud statutes in New Jersey ÔÇö the elements of the use of United States mail or wire are of purely federal design. However, an analysis of both statutes reveals that the felon is not being punished for using the mails or the wires as much as he is being punished for his attempt to deceive or obtain money or property by false pretenses. The element of the use of mails and wires is purely jurisdictional. The underlying offense is the attempt to scheme or defraud or take money or property under false pretenses. The New Jersey Code of Criminal Justice provides for theft crimes of this nature under N.J.S.A. 2A:111-1 and N.J.S.A. 2C:20-4. The latter statute, which is the current law in this State provides:
A person is guilty of theft if he purposely obtains property of another by deception....
The former statute, N.J.S.A. 2A:111-1, specifically mentions obtaining money or property by false pretenses in the following manner:

*278 Any person who, knowingly or designedly, with intent to cheat or defraud any other person, obtains any money, property, security, gain, benefit, advantage or other thing of value by means of false promises, statements ... is guilty of a misdemeanor.
While only one of these statutes addresses obtaining money, etc., by false pretenses specifically, both reveal an overriding element of dishonesty through fraudulent conduct. In addition, it is obvious that one who uses public office to obtain money under false pretenses or otherwise defraud another person or entity has committed a crime which affects the public office. Finally, under N.J.S.A. 2C:20-2(b), the crime of theft is a crime of the third degree since the amounts involved in the mail and wire fraud exceeded the sum of $500. Therefore, all the elements are present to make the federal crimes of mail and wire fraud constitute offenses involving dishonesty, and crimes of the third degree or better (apparently they also touched upon Musto's public office). Of course, it is not necessary that the latter two elements be present in order to trigger the application of N.J.S.A. 2C:51-2(a).
Counts 29 and 30 charge Musto with obstructing interstate commerce by extortion; by obtaining sums of money with the consent of the giver, the consent having been induced under color of official right. Count 31 involves an allegation that he and others used the color of their official positions to obtain an agreement to obtain a bribe in the amount of $125,000 in connection with a sale of the Vista View building in Union City. 18 U.S.C.  1951 provides in pertinent part as follows:
(a) Whoever in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by ... extortion or attempts or conspires so to do, or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do anything in violation of this section shall be guilty of an offense.
The pertinent term in that statute applied to the indictment of Musto is "extortion." During the period covered by counts 29 and 30 extortion was both a common law and statutory crime. N.J.S.A. 2A:105-1. There is a distinction between the crime of extortion and that of bribery. Bribery consists in offering a *279 present or receiving one, while extortion consists in demanding an illegal fee or present by color of office. 31 Am.Jur.2d,  2 at 902; State v. Begyn, 34 N.J. 35, pp. 45-48 (1980). The purpose of our extortion statute was simply to punish the officer who illegally took the fee. In bribery both the officer and the recipient are guilty of the offense. State v. Seaman, 114 N.J. Super. 19 (App.Div. 1971). The essence of the offense of extortion is the receiving or taking by any public officer by color of his office of any fee or reward not allowed by law for performing his duties. State v. Begyn, supra, 34 N.J. at 46. The three essential elements which must be proved to establish extortion under the federal offense are that (1) defendant induced the victim to part with his property; (2) defendant did so knowingly and willfully by means of extortion, that is, with the person's or business' consent having been induced under color of official right, and (3) the extortionate transaction delayed, interrupted or adversely affected interstate commerce.
Naturally, the third element is purely jurisdictional and there is no comparable requirement in the State of New Jersey. However, it would not be necessary to prove that element in order to convict a defendant of extortion in the State of New Jersey, either at common law or under the statute, which appears on its face to have been originally intended to be iterative of the common law. State v. Goodman, 9 N.J. 569, 584; State v. Begyn, supra. Therefore, with regard to counts 29 and 30, there can be no doubt that these crimes are offenses which if committed in the State of New Jersey would involve dishonesty or be a crime of the third degree.
Extortion has been carried over into our Code of Criminal Justice, which was effective September 1979, in N.J.S.A. 2C:20-5 and in the Table it is also keyed to N.J.S.A. 2C:27-2 and 6, involving bribery and gifts to public servants.
Count 31 is an attempt to commit extortion, which appears to be as well a crime under the Code as it was at common law and statutorily prior to the adoption of the Code. The degree of the *280 crime may vary under the Code, dependent upon the amount of money involved. However, the sums involved in the Musto case appear to be more than adequate to reach a third degree crime and, in any event, the offenses would involve dishonesty.
The crime of extortion committed by Musto would constitute a crime of the third degree or above, according to N.J.S.A. 2C:20-2b(1), which states that "theft constitutes a crime of the second degree if the property is taken by extortion." In any event, the offense involved dishonesty.
Count 32 alleges a violation of the Travel Act, 18 U.S.C.A.  1952, which prohibits interstate travel to promote and facilitate a bribery scheme. The statute reads, in pertinent part, as follows:
Whoever travels in interstate or foreign commerce . .. with the intent to promote ... any unlawful activity ... shall be guilty of an offense against the United States. (b) As used in this section, "unlawful activity" means ... bribery in violation of the law of the State in which committed.
Again, we have a federal offense which may be broken down into a jurisdictional element and an underlying element. The travel in interstate commerce is merely jurisdictional and is of no significance for the purpose of locating a comparable state statute. However, the underlying offense is described as "unlawful activity" and is defined as "bribery in violation of the laws of the State in which committed." Of course, bribery is a crime in New Jersey under a variety of statutes, N.J.S.A. 2A:93-4 and 6, and N.J.S.A. 2C:27-2 and 3. Since bribery is clearly an offense which involves dishonesty, the additional elements of the forfeiture statute, although present in this case, need not be shown to prompt application of the forfeiture statute.
Counts 37 and 38 charge Musto with a violation of 26 U.S.C.A.  2706(1), which reads as follows:
Any person who ÔÇö
(1) ÔÇö Willfully makes and subscribes any return, statement, or other document, which contains or is verified by a written declaration that it is made under the penalties of perjury, and which he does not believe to be true and correct as to every material matter; ... shall be guilty....
*281 Musto was charged with having knowingly and willfully made and subscribed, or caused to be made and subscribed, under penalties of perjury, income tax returns for himself and his wife for the two calendar years 1978 and 1979 which they did not believe to be true and correct as to the total amount of income they reported for those years.
The subject matter of these violations was federal income tax returns. Of course, there is no state statute which forbids the false subscription to federal income tax returns. However, there are, of course, penalties concerning New Jersey income tax returns. See N.J.S.A. 54A:9-15.
Despite the federal nature of the tax return, the underlying element in the crime is the perjury or false swearing to which the defendant was a willing party. Defendant is charged with placing his signature on a document which he did not believe to be true, in violation of the federal statute. The perjury statute in effect in 1977 and 1978, and apparently undisturbed by the adoption of the Code of Criminal Justice, is N.J.S.A. 41:3-1, which provides:
If any person shall willfully and corruptly swear, affirm or declare falsely, in or by any oath, affirmation, declaration or affidavit, required to be made or taken by any statute of this state, or necessary or proper to be made, taken or used in any court of this state, or for any lawful purpose whatever, such person shall be deemed guilty of perjury.... [Emphasis supplied]
Since a violation of 26 U.S.C.A.  7206(1) encompasses an act of perjury or false swearing, that federal offense would be a violation of the New Jersey perjury statute. Perjury and false swearing are offenses under the Code, N.J.S.A. 2C:28-1 et seq., although false swearing is an offense of the fourth degree, N.J.S.A. 2C:28-2(a). However, these clearly involve dishonesty since the offense reveals an attempt to defraud the Federal Government. In similar fashion, the state offenses of perjury and false swearing are offenses involving dishonesty.
As revealed by this crime-by-crime analysis and comparison, there is no basis for Musto's contention that the forfeiture statute (N.J.S.A. 2C:51-2) is inapplicable to him. The underlying *282 elements of the federal crimes for which he was convicted are all offenses under New Jersey law. The comparable state offenses of bribery, extortion, conspiracy, perjury and false swearing all constitute offenses involving dishonesty since they reveal an intent to defraud or deceive. Therefore, it appears that the requirements of N.J.S.A. 2C:51-2 have been fulfilled. Thus the forfeiture statute applies to Musto, if it is constitutional.

II. Constitutionality of the Statute

A legislative enactment is presumptively constitutional. Every intendment is to be made in favor of the validity of the statute. Stothers v. Martini, 6 N.J. 560, 567 (1951); State v. Thermoid Co., 16 N.J. 274, 279 (1954). The Legislature is presumed to have intended its enactments to meet constitutional requirements. State v. Profaci, 56 N.J. 346 (1970). The cardinal principle of statutory construction must be to save and not to destroy.
The duty of the court is to strain, if necessary, to save the act, not to nullify it. New Jersey Sports & Expo. Auth. v. McCrane, 119 N.J. Super. 457, 476 (Law Div. 1971), mod. on other grounds, 61 N.J. 1 (1972), app. dism. 409 U.S. 943, 93 S.Ct. 270, 34 L.Ed.2d 215 (1973), appeal after remand In re Sports Complex Hackensack Meadowlands, 62 N.J. 248 (1973), cert. den. 414 U.S. 989, 94 S.Ct. 291, 38 L.Ed.2d 228 (1974). This comment by Judge (now Justice) Pashman was cited with approval in Vreeland v. Byrne, 72 N.J. 292, 325 (1977).
When a state statute is challenged on state constitutional grounds, the nature of state government and the distribution of sovereign power within it make a plaintiff's burden a heavy one. Smith v. Penta, 81 N.J. 65, 74 (1979).
The right to hold public office is a valuable one and its exercise should not be declared prohibited or curtailed except by plain provisions of law. In re Ray, 26 N.J. Misc. 56, 59 (Circ.Ct. 1947), cited in Stothers v. Martini, supra 6 N.J. at 565. At the *283 time of his conviction and sentencing Musto held two public offices ÔÇö that of state senator and municipal commissioner and mayor. The office of senator is a constitutional office, whereas that of commissioner is a statutory office. N.J.S.A. 2C:51-2(a) applies to persons "holding any public office, position or employment, elective or appointive, under the government of this State or any agency or political sub-division thereof...." Thus, the statute applies to both offices. Since the effect of this statute on persons holding constitutional offices may differ from that on those holding statutory, elective or appointive offices, they will be treated separately.

A. Senator

Musto advances two arguments in support of his contention that the statute is unconstitutional: (1) the provisions of subsec. (c) of the statute create an unconstitutional added qualification, i.e., the candidate must not have been convicted of certain crimes; (2) the method for removal of a senator as set forth in the Constitution is the sole and exclusive method. Therefore the provisions of subsec. (a) of the statute calling for forfeiture upon conviction of certain crimes is unconstitutional.
These arguments will be addressed separately and in that order.

1. N.J.S.A. 2C:51-2(c) Creates an Added Qualification for Office.

Eligibility for membership in the Senate is set forth in Art. IV,  I, par. 2, of the N.J. Constitution as follows:
No person shall be a member of the Senate who shall not have attained the age of thirty years, and have been a citizen and resident of the State for four years, and of the district for which he shall be elected one year, next before his election.... No person shall be eligible for membership in the Legislature unless he be entitled to the right of suffrage.
It is conceded that at the time of his election to the Senate Musto met those qualifications. Art. II, par. 7 of the N.J. Constitution provides:

*284 The Legislature may pass laws to deprive persons of the right of suffrage who shall be convicted of such crime as it may designate. Any person so deprived when pardoned or otherwise restored by law to the right of suffrage, shall again enjoy that right.
Pursuant to that authority the Legislature has enacted N.J.S.A. 19:4-1, which provides in pertinent part, as amended, as follows:
No person shall have the right of suffrage ÔÇö
...
(8) who is serving a sentence or is on parole or probation as the result of a conviction of any indictable offense under the laws of this or another state or of the United States.
It is argued that Musto no longer is entitled to the right of suffrage and thus not eligible for membership in the Legislature. However, he is not in fact presently serving the sentence imposed upon him, since it has been stayed pending appeal; nor is he on parole or probation as a result of his conviction.
The Cumberland County Court in 1978 concluded that a person was entitled to vote, notwithstanding that he had been convicted and sentenced to a term in the Federal Penitentiary, because pending the date upon which he was required to surrender he was free on his own recognizance. The court concluded that under the unambiguous language of the statute as presently written, a sentenced federal prisoner who has not yet surrendered was not disenfranchised. Hitchner v. Cumberland Cty. Bd. of Elections, 163 N.J. Super. 560 (Cty.Ct. 1978). Similarly, Musto as a sentenced federal prisoner whose sentence has been stayed pending appeal and is neither on probation or parole, may not be disenfranchised. Thus, it appears that at this time Musto also meets the added constitutional qualification of being entitled to the right of suffrage.
Musto argues that the Legislature may not add to the qualifications created by that Constitution. There is substantial authority for that contention. In a case in which the Supreme Court was required to determine whether the oaths for legislators and other state officers embodied in the Constitution of 1947 were exclusive and therefore beyond the power of the Legislature to add to, subtract from or in any wise vary, the court said:

*285 ... if the Legislature may alter these oaths or any other provisions of the Constitution prescribing the qualifications for office (such as age, citizenship, residence and prohibition of dual office holding) it would to the extent of such variance nullify the Constitution. [Imbrie v. Marsh, 3 N.J. 578, 585 (1950)]
The Imbrie court quoted from the Court of Errors and Appeal in Johnson v. State, 59 N.J.L. 535, 536, 538 (E. & A. 1896):
When the constitution prescribes the manner in which an officer shall be appointed or elected, the constitutional prescription is exclusive, and it is not competent for the legislature to provide another mode of obtaining or holding the office.
and further quoted from opinion of the Supreme Court in 1916, State v. Carrigan, 82 N.J.L. 225, which held that an act which disqualified persons convicted of crime from voting or holding office was unconstitutional, the court saying:
... because it undertakes to add to the qualifications of voters as prescribed in the constitution itself.
However, see Sagarese v. Holland, 120 N.J.L. 570 (Sup.Ct. 1938), which upheld a statute providing that "no person who has been convicted of a misdemeanor or higher crime shall qualify as a justice of the peace." Although it was urged that the statute violated the provision of the Constitution concerning the election of justices of the peace, the court concluded that, "It is of great public importance that only men of character hold the office of justice of the peace."
The Attorney General argues that the qualifications stated in N.J.Const. (1947), Art. IV,  I, par. 2, are minimum qualifications and that the Constitution itself establishes further qualifications for membership in the State Legislature. N.J.Const. (1947), Art. IV,  V, par. 4, provides that no member of Congress, no person holding any federal or state office or position and no judge of any court shall be entitled to a seat in the Legislature. Further, Art. IV,  V, par. 3, disqualifies any member of the State Legislature from becoming a member of Congress or accepting any federal or state office. If a member of the State Legislature takes a seat in Congress or accepts any other federal or state office, he is disqualified from serving and his seat shall thereupon become vacant. The Attorney General further notes that N.J.S.A. 2C:51-2(c) may be viewed as a *286 shared legislative statement on the qualifications of members of the Legislature in exercise of the power recognized in N.J.Const. (1947), Art. IV,  IV, par. 2, to judge qualifications. See State v. Twitchell, 59 Wash.2d 419, 367 P.2d 985, 992 (1962) (forfeiture statute; a legislative statement on qualifications for holding office).
Counsel for the Senate observes that in reaching its decision in Imbrie v. Marsh, supra, the court invoked the maxim expressio unius est exclusio alterius, i.e., the expression of one thing is the exclusion of another, or mention of one thing implies exclusion of another. Yet, throughout the past quarter-century our Supreme Court has repeatedly held this maxim to be nothing more than a guide to interpretation and particularly subordinate to the rule of statutory construction which compels the court to construe a statute so as to realize rather than defeat its legislative purpose.
In Reilly v. Ozzard, 33 N.J. 529 (1960), the Supreme Court was called upon to decide whether the common law doctrine prohibiting dual holding of incompatible offices barred a member of the State Senate from holding the post of township attorney. The senator argued that since the post of township attorney was not a state office, application of the common law doctrine prohibiting dual office holding of incompatible offices would have the effect of an added qualification for eligibility in the Legislature. He contended that the Constitution exhausted the subject of dual-office holding by legislators, citing Art. III, par. 1 and Art. IV,  VII, pars. 3 and 4. Chief Justice Weintraub, speaking for the Supreme Court, rejected these arguments. He refused to apply the maxim expressio unius est exclusio alterius, noting that the maxim is, at best, merely an aid to interpretation. He expressed the view that the final question is "whether in a given context an express provision with respect to a portion of an area reveals by implication a decision with respect to the remainder. The issue is one of intention. The answer resides in the common sense of the situation." In answering that question he concluded:

*287 A constitution does not resolve all policy problems. Rather it establishes the framework of government with such specific restraints as are thought to be of eternal value and hence worthy of immunity from passing differences of opinion. If the sense of the situation suggests that an affirmative specification was meant to be exclusive, as, for example, a statement of the qualifications for office, no more may be added. Imbrie v. Marsh, supra, 3 N.J. 578 (1950). On the other hand, for further example, the fact that the Constitution assures absentee voting by military personnel does not deny the Legislature a voice in the policy question whether a like opportunity should be granted to civilian absentees. Gangemi v. Berry, 25 N.J. 1 (1957).
Where, as here, the constitutional provision is prohibitory in nature, it surely can not mechanically be inferred that what was not prohibited was thereby affirmatively guaranteed. The decision to prohibit is simply a decision to foreclose a contrary view as to the area dealt with. What is left untouched remains within the jurisdiction of government.... [at 539]
In the Gangemi case, supra, the court said:
The maxim that the express mention of one thing implies the exclusion of another is purely interpretive in aid of intention, and not a rule of law; and it is not to have an arbitrary application at variance with its true purpose. [25 N.J. at 11]
And more recently, in State v. DiCarlo, 67 N.J. 321 (1975), the court said:
Both of these rules of statutory construction are subordinate to the higher principle that insofar as possible statutes should be construed by the courts so as to realize rather than defeat the legislative purpose. [at 331]
As stated, there is substantial authority for the contention advanced by Musto. In support of that position he offers the language of the Appellate Division in Imbrie v. Marsh, 5 N.J. Super. 239 (App.Div. 1949), aff'd 3 N.J. 578 (1950), wherein the court stated:
The respondents say that no one has a constitutional right to be Governor of New Jersey or a member of the Legislature. We think that he has such a right, provided, of course, the people select him for office and he is eligible according to the Constitution. But more important is the right of the people of the State, their right under our democratic system of government to choose whom they will for office, unless the candidate is disqualified by some provision of our constitution. They have the right to select unworthy candidates, candidates whom the Legislature fears might bring ruin to the State. That is an essential part of the American system. The Legislature has no authority to curb this right of the people. [at 245]
As noted above, this decision was affirmed by the Supreme Court at 3 N.J. 578. Musto cites a number of decisions from our sister states which are in accord. Kilday v. State, 75 S.W.2d 148 *288 (Tex.Civ.App. 1934) aff'd, 123 Tex. 549, 75 S.W.2d 253 (1934). This case involved an attempt to prevent the name of a nominee for governor from being placed on the official ballot by reason of a candidate's violation of a limit on primary campaign spending contained in a Corrupt Practices Act. The court held that the statute could not operate to bar the nominee from running for governor since it went beyond the constitutional qualifications. In answer to the argument that the statute did not set forth an additional qualification for office but was merely a penalty by way of forfeiture, and therefore within the power of the Legislature, the court said:
... The attempt to maintain a bar to the right to go upon the official ballot as a candidate for the office of governor, upon the theory that it is a penalty by way of forfeiture and not a disqualification, is a refinement of legal reasoning that belongs only to the period of our judicial history in `the tragic era' ... The structure of our government does not rest upon such fine points but rather upon broad and plain principles easily perceived by all. [at 150-151]
A collection of cases to like effect are set forth in 34 A.L.R.2d 155, under the caption "Legislative power to prescribe qualifications for or conditions of eligibility to constitutional office." See Opinion of the Justices, 291 Ala. 581, 285 So.2d 87 (1973); Opinion of the Justices, 290 A.2d 645 (Del.Sup.Ct. 1972); Whitney v. Bolen, 85 Ariz. 44, 330 P.2d 1003 (Sup.Ct. 1958) (citing Imbrie v. Marsh, supra) 330 P.2d at 1005; In re Petition of Justice of the Peace Association of Indiana, 147 N.E.2d 16 (Ind.Sup.Ct. 1958); Wallace v. Superior Court, 141 Cal. App.2d 771, 298 P.2d 69 (1956) (citing Imbrie v. Marsh, supra, and in particular the following statement by Chief Justice Vanderbilt):
It would seem but fair reasoning upon the plainest principles of interpretation, that when the Constitution established certain qualifications as necessary for office, it meant to exclude all others as prerequisite. From the very nature of such a provision the affirmation of these qualifications would seem to imply a negative of all others * * *. A power to add new qualifications is certainly equivalent to the power to vary them. 1 Story, Commentaries on the Constitution,  625.
The Legislature can not add to the constitutional qualifications of an officer. 1 Cooley on Constitutional Limitations, 140.
State ex rel. Powers v. Welsch, 198 Or. 670, 259 P.2d 112 (1953) (citing Imbrie v. Marsh, supra), in which the court also said:

*289 The Constitution of the State, unlike that of the Federal Constitution, is one of limitation of powers, and, unless the legislative act is prohibited, expressly or impliedly, by the Constitution, it must be held valid, and before the court will declare an act unconstitutional, it must appear to be such beyond a reasonable doubt. State v. Cochrane, 55 Or. 157, 179, 104 P. 419, 105 P. 884. [198 Or. 670, 259 P.2d at 114]
It isn't necessary for the court to determine whether N.J.S.A. 2C:51-2(c) constitutes an added qualification for a constitutional officer, that he not have been convicted of a crime. This case is not an attempt to exclude Musto from assuming a senate seat. He was a sitting senator at the time of his conviction and sentencing. In Powell v. McCormack, 395 U.S. 486, 89 S.Ct. 1944, 23 L.Ed.2d 491 (1969), the court noted the distinction between exclusion and expulsion. As Justice Douglas said in his concurring opinion:
And if this were an expulsion case I would think that no justiciable controversy would be presented, the vote of the House being two-thirds or more. But it is not an expulsion case. Whether it could have been won as an expulsion case no one knows. Expulsion for `misconduct' may well raise different questions, different considerations. Policing the conduct of members, a recurring problem in the Senate and House as well, is quite different from the initial decision whether an elected official should be seated. It well might be easier to bar admission than to expel one already seated. [at 555, 89 S.Ct. at 1981]
After describing an attempt to exclude a senator-elect from North Dakota 26 years previously, whose activities were particularly colorful (see footnote 18 at 556, 89 S.Ct., footnote 18 at 1982), Justice Douglas made this observation:
The Senate was nonetheless troubled by the suggestion that the Constitution compelled it to accept anyone whom the people might elect, no matter how egregious and even criminal his behavior. No need to worry said Murdock. It is true that the Senate can not invoke its majority power to "judge" under Art. I,  5, cl. 1, as a device for excluding men elected by the people who possess the qualifications enumerated by the Constitution. But it does have the power under Art. I,  5, cl. 2 to expel anyone it designates by a two-thirds vote. Nonetheless he urged the Senate not to by-pass the two-thirds requirement for expulsion by wrongfully invoking its power to exclude [at 559, 89 S.Ct. at 1983]
The court should confine itself to ruling upon what is before it. It is not the exclusion of Musto that is before the court, but rather his removal, the forfeiture of his office. This court therefore expresses no view on the constitutionality of N.J.S.A. 2C:51-2(c), insofar as it is alleged to be an unconstitutional *290 added qualification for a constitutional office. Its applicability to a statutory office will, however, be dealt with under Point II C. Thus, we come to the second point advanced by Musto.

(2) Constitutional Method of Expulsion or Removal is Exclusive.
Although the Powell case implies that the constitutional method of removal is the exclusive one, unlike the Federal Constitution, our State Constitution is not a grant, but rather a limitation of powers. State v. Murzda, 116 N.J.L. 219 (E. & A. 1936); Gangemi v. Berry, 25 N.J. 1, 7 (1957). The Legislature is vested with all powers not constitutionally forbidden. Gilbert v. Gladden, 87 N.J. 275, 283 (1981).
The Federal Government possesses only those powers ceded to it by the states in the Federal Constitution; the states possess all other powers of government. These reserved powers of government repose in the people but are exercised by the Legislature as the representative of the people. N.J.Const., Art. IV,  I, par. 1. As such repository of these reserve powers, the Legislature is free to act except (1) in respect of powers delegated to the Federal Government by the Constitution of the United States and (2) as such exercise may be limited by the State Constitution. There are no other restraints upon state legislative power. Smith v. Penta, 81 N.J. 65, 74 (1979).
In Gangemi v. Berry, supra, the court quoted from Cooley's Constitutional Limitations (8 ed.), 81, 175 et seq., 180, note:
[The people] in framing the constitution, committed to the Legislature the whole lawmaking power of the state, which they did not expressly or impliedly withhold. Plenary power in the legislature for all purposes of civil government is the rule. A prohibition to exercise a particular power is an exception. In inquiring, therefore, whether a given statute is constitutional, it is for those who question its validity to show that it is forbidden. People ex rel. Wood v. Draper, 15 N.Y. 532, 543 (App.Ct. 1857). Denio, Ch. J. The American legislatures `have the same unlimited power in regard to legislation which resides in the British Parliament, except where they are restrained by written constitutions. That must be conceded, I think to be a fundamental principle in the political organizations of the American states. We can not well comprehend how, upon principle, it should be otherwise. The people must of course, possess all legislative *291 power originally. They have committed this in the most general and unlimited manner to the several state legislatures, saving only such restrictions as are imposed by the constitution of the United States, or of the particular state in question. Thorpe v. Rutland & Burlington Railroad Co., 27 Vt. 140 (Sup.Ct. 1854), Redfield, Ch. J.
And the inhibition of a Constitution "may be either express or implied; that is, the Constitution may expressly prohibit any specified act of the Legislature, or the Constitution by its inherent terms may of necessity prohibit certain acts of a Legislature by reason of the inherent conflict that would arise between the terms of the Constitution and the power claimed in favor of the Legislature." State ex rel. Richards v. Whisman, 36 S.D. 260, 154 N.W. 707, L.R.A. 1917 B, 1 (Sup.Ct. 1915).
While the question of the exclusiveness of the remedies provided by our Constitution for the removal of constitutional officers has not been heretofore decided by appellate courts in this State, it has been addressed in reported opinions of the Law Division. In Winne v. Bergen Cty., 36 N.J. Super. 532 (Law Div. 1955), in determining whether a superceded county prosecutor was entitled to compensation, the court referred to an earlier forfeiture statute:
The office and term of a constitutional public officer may be terminated only by impeachment (N.J.Const. 1947, Art. VII,  III), resignation, death of the incumbent, or by forfeiture for conviction of a crime touching the administration of the office or which involves moral turpitude (R.S. 2:160-9, N.J.S.A. 2A:135-9). [at 538; emphasis supplied]
In its decision reversing the trial court, 21 N.J. 311, the Supreme Court said:
We assume, as the plaintiff urges, that his office could be terminated only by impeachment pursuant to Art. VII,  III, par. 1 (but cf. N.J.S. 2A:135-9) and that any steps aimed at circumventing the prescribed method would be stricken by the courts. [at 316; emphasis supplied]
The second case in which the issue arose dealt with the removal of a sheriff under the provisions of N.J.S.A. 2A:81-17.2a3. In Shusted v. Coyle, 139 N.J. Super. 314 (Law Div. 1976), the court held that it was the intention of the framers of the Constitution to permit the removal of constitutional officers only by impeachment and not by action in lieu of prerogative writs. The opinion is brief and does not discuss in any great detail its reasoning. In that decision the court did not consider the fact that removal of constitutional officers may be accomplished *292 by means other than impeachment, i.e., see N.J.Const., Art. V,  IV, par. 5, removal by governor for cause (not all constitutional offices); N.J.Const., Art. IV,  IV, par. 3, expulsion by the Legislature; N.J.Const., Art. VI,  VI, par. 4, removal of judges by the Supreme Court; the creation of a vacancy when a member of a Legislature shall become a member of Congress or shall accept any federal or state office or position, N.J.Const., Art. IV,  V, par. 3. Clearly, the Constitution provides for the removal of constitutional officers by other means than impeachment. In an unreported case this court ruled that the surrogate, as a constitutional officer, had forfeited his office by running for municipal office in West New York, pursuant to N.J.S.A. 2A:11-2. See Clark v. DeFino, 80 N.J. 539 (1979).
In Shusted the attempt was to remove the sheriff by an action in lieu of prerogative writs, pursuant to N.J.S.A. 2A:81-17.2a, 3 and 4, for admitting to the commission of misdemeanors touching the administration of his office before a county grand jury. The defendant had sought to stay the action pending the outcome of an indictment which had been handed down by the grand jury alleging the same misdemeanors, or, in the alternative, for dismissal of the prerogative writ. The judge did not address the question of forfeiture of a constitutional office for a conviction of crime, as provided by N.J.S.A. 2A:135-9, since the sheriff was only under indictment and had not been convicted. Perhaps the conclusion of the judge, relied upon by Musto, was only made in the context and setting in which the case was presented to it. If the judge intended his conclusion, "the clear meaning of these cases stands that the remedy of impeachment, while not exclusive of other remedies exerted for the public good, is exclusive as the remedy to be exerted for the removal of a constitutional officer from office," as a declaration that the forfeiture statute then in effect, N.J.S.A. 2A:135-9, was unconstitutional, then I must respectfully disagree with my colleague. (He did not articulate a finding of unconstitutionality of any *293 statute as to constitutional officers, even as to N.J.S.A. 2A:81-17.2a3, except by implication.
N.J.S.A. 2C:51-2(a) has not heretofore been interpreted by the courts. However, before the enactment of this legislation, there was a variety of statutes calling for the forfeiture of public offices upon conviction of crime. See 2 New Jersey Penal Code, Commentary, Final Report of New Jersey Criminal Law Revision Commission, at 361.
The most important statute in this regard was N.J.S.A. 2A:135-9, which provided:
Any person holding an office or position, elective or appointive, under the government of this state or of any agency or political sub-division thereof, who is convicted upon, or pleads guilty, non vult or nolo contendere to, an indictment, accusation or complaint charging him with the commission of a misdemeanor or high misdemeanor touching the administration of his office or position, or which involves moral turpitude, shall forfeit his office or position and cease to hold it from the day of his conviction or entry of plea.
If the conviction of such officer be reversed, he shall be restored to his office or position with all the rights and emoluments thereof from the date of the forfeiture.
Prior to the enactment of Title 2A, this same statute was contained in R.S. 2:160-9 and 10 in somewhat different language.
There have also been a wide variety of statutes which provide that persons convicted of certain crimes be disqualified to hold any office of honor, trust, or profit under this State, similar to that contained in the Constitution concerning those who are impeached. Significant among these statutes are N.J.S.A. 2A:93-2, which reads as follows:
Any person who directly or indirectly gives, offers or promises any money, real estate, service or thing of value as a bribe, present or reward, to obtain, procure or influence the opinion, behavior, vote or abstention from voting of any member of the senate or general assembly, upon any bill, resolution, election, appointment or other proceeding pending before the legislature, or before either house, or before both houses in joint meeting, and the member of the senate or general assembly, or other person who directly or indirectly receives or accepts the same, are guilty of a high misdemeanor.
and N.J.S.A. 2A:93-5 which provides:
Any person convicted of an offense under  2A:93-2  2A:93-4 of this title, or any judge or magistrate who receives or accepts a bribe, present or reward in *294 violation of  2A:93-1 of this title, shall, in addition to the punishment prescribed for such offense, be forever disqualified from holding any office or position of honor, trust or profit under this State. [Emphasis supplied]
Thus, at the time of the adoption of our present Constitution in 1947 there was legislation in effect which provided for the forfeiture by persons holding offices or positions, elective or appointive, under the government of the State, as well as a specific statute providing that the conviction of a legislator for the acceptance of a bribe would forever disqualify him from holding any office or position of honor, trust or profit under this State. These statutes are now embodied in N.J.S.A. 2C:51-2(a), (c). Yet there was no express provision included in the Constitution of 1947 vitiating that legislation, notwithstanding that many public offices had been forfeited under its provisions.
In fact, there is provision in the Constitution to the contrary. N.J.Const. 1947, Art. XI,  I, par. 3:
All law, statutory and otherwise, all rules and regulations of administrative bodies and all rules of courts in force at the time this Constitution or any Article thereof takes effect shall remain in full force until they expire or are superceded, altered or repealed by this Constitution or otherwise.
This subject was discussed in Russo v. Walsh, 18 N.J. 205, where the court said:
It is important to note that when the 1947 Constitution was drafted and debated in the Convention, the Vanderbach [v. Hudson County Board of Taxation, 133 N.J.L. 499] decision represented the most recent and the only authoritative determination in this jurisdiction on the scope of the removal power, and it is permissible to infer that the draftsmen and the delegates were cognizant of the decision and its import during their deliberations and findings. [at 211]
One of the delegates to the 1947 Constitutional Convention was Walter G. Winne, who later argued that his office as county prosecutor could be terminated only by impeachment pursuant to Art. VII,  III, par. 1, of the N.J. Constitution. As noted, the Supreme Court, in assuming the accuracy of Winne's argument for purposes of his case, nonetheless noted parenthetically (but cf. N.J.S.A. 2A:135-9) in Winne v. Bergen Cty., 21 N.J. 311, 316. At the Constitutional Convention it was Winne who offered an amendment to a committee proposal clarifying the Governor's power to remove officers and employees paid by the State so as *295 to not apply to state officers paid by the county. Proceedings of the Constitutional Convention of 1947, 180-181, and another amendment giving the officer or employee removed by the Governor the right of judicial review, id. 263. No one proposed that the provisions of N.J.S.A. 2A:135-9 or 2A:93-2 and 5 be repudiated, and they remained in full force and effect after adoption of the constitutional provisions to N.J.Const. (1947), Art. XI,  I, par. 3.
N.J.S.A. 2A:135-9 was construed in Hayes v. Hudson Cty. Freeholder Bd., 116 N.J. Super. 21 (App.Div. 1971), in which a member of the board of freeholders was convicted of an offense. The trial court had held that no vacancy existed under the statute because, although declaring the forfeiture, it provided for restoration to office in the event of reversal of the conviction (as does N.J.S.A. 2C:51-2(b)(2)). The Appellate Division reversed. It held that conviction of a board member of a misdemeanor touching the administration of his office resulted in a vacancy on the board; the convicted member to be revested in office upon reversal of his conviction prior to the end of his original term. In reaching its decision the court quoted from the language of an Illinois case, People ex rel. Keenan v. McGuane, 13 Ill.2d 520, 150 N.E.2d 168, (Sup.Ct. 1958):
Respect for the law and confidence in public officers can not be compelled. These attributes stand as a voluntary tribute to just laws and integrity in public office. While they exist, both the law and the officials shall retain public trust. Confidence in an elected official is destroyed when he is convicted of an infamous crime * * * While neither the constitution nor the statutes affecting its purpose define the term `conviction' yet respect for the law and deference to the transcendent trust placed in public officials requires that such officer forfeit his office after the presumption of his innocence is dispelled by conviction of an infamous crime in a trial court. [150 N.E.2d at 177]
Our Appellate Division concluded that the foregoing expression was fully applicable in the State of New Jersey.
The statute was likewise applied to a police officer in O'Halloran v. DeCarlo, 156 N.J. Super. 249 (Law Div. 1978), aff'd 162 N.J. Super. 174 (App.Div. 1978), cert. den. 442 U.S. 917, 99 S.Ct. 2837, 61 L.Ed.2d 284. As noted under section I, the Law Division decided that where intent to defraud is an essential *296 element of the crime, that crime is one involving moral turpitude. The Appellate Division agreed with the trial judge.
The Supreme Court of Arizona dealt with the precise problem presented in this case in an analogous case. In State ex rel. DeConcini v. Sullivan, 66 Ariz. 348, 188 P.2d 592 (Sup.Ct. 1948), the Attorney General of the state was found guilty of a criminal offense and sentenced to imprisonment. The Governor appointed one DeConcini to the office. An action in quo warranto was brought by DeConcini against the former Attorney General, Sullivan, who was alleged to have unlawfully unsurped, held and exercised the office.
Under the Arizona Constitution the office of Attorney General is a constitutional office. It contains provisions similar to those in the New Jersey Constitution relating to impeachment and removal by a vote of two-thirds of the Senate. In a legislative enactment defining vacancies ( 12-404), it provides: "An office shall be deemed vacant from and after ... his conviction of a felony or of any offense involving a violation of his official duties." Sullivan contended that where the Constitution provides a method for the impeachment (removal) of officers, that method is exclusive and the power which the Legislature might otherwise be regarded as possessing is taken away. He cited as authority for that proposition 43 Am.Jur., Public Officers,  182 (63 Am.Jur.2d  178 at 736), as follows:
The constitution of a state may place beyond the reach of hostile legislation the method and grounds for removing incumbents of offices or of certain offices; and where the constitution prescribes the method of removal and the causes for which public officers may be removed, the method and grounds established by this instrument are exclusive and it is beyond the power of the Legislature to remove incumbents in any other manner, or for any other cause....
Because of the remarkable similarity between the Arizona case and this case and the persuasive logic of the reasoning of that court which is equally applicable in answer to the argument presented by Musto here, extensive sections of that opinion are quoted. The Arizona court made this observation:
Courts of last resort in several states with constitutions not dissimilar to ours have held that where the constitution provides for removal by impeachment that *297 remedy is exclusive. It was so held in People v. Shawrer, 30 Wyo. 366, 222 P. 11. This case contains an exhaustive survey of the cases adopting this rule. Practically all of the state constitutions provide for removal by impeachment. In many of them there are legislative provisions similar to our  12-404 declaring a vacancy to exist in an office when the holder thereof has been convicted of a felony or any offense involving a violation of his official duties. Such legislation has been sustained upon the theory that where it is not prohibited by the Constitution it is valid and within the province of the legislature to provide that vacancies in office shall be created in addition to and otherwise than by methods prescribed in the constitution.... [at 597]
The court further quoted from one of its earlier cases in which it said,
The Constitution of Arizona is not, as is the Constitution of the United States, to be considered a grant of power or enabling act to the Legislature, but rather is a limitation upon the power of that body, and that the Legislature is vested with the whole of the legislative power of the state, and may deal with any subject within the scope of civil government unless it is restrained by the provision of the Constitution, and the presumption that the Legislature is acting within the Constitution holds good until it is made to appear in what particular it is violating constitutional limitations (citations omitted). We do not look to the (state) Constitution to determine whether the Legislature is authorized to do an act but only to see if it is prohibited. [Ibid.]
The court concluded:
The question then becomes whether Art. 8, Part 2,  1 and 2 of our Constitution providing for impeachment of certain public officers and their removal from office constitute either directly or by implication an exclusive remedy having the effect of prohibiting the legislature from devising supplemental methods of removal such as they did by passing  12-404. It is illogical to assume that impeachment is an exclusive remedy in the light of the history of its development. The purpose of impeachment is to serve as an added protection to the public against those officers who may be so powerful as to effectively block court action against themselves. It was never intended nor did it develop as a safeguard to the officer concerned. [at 598; emphasis added]
The constitution specifically preserves the right of trial in regular courts to officers subject to impeachment and thus specifically denies the exclusiveness of the impeachment process in regard to these officers (as does the New Jersey Constitution).
The final observations by the Arizona court are particularly appropriate here as well:
The wording of our Constitution and statute, the purpose of impeachment, and common sense all indicate that the effort of both the legislature and the framers of the Constitution was to provide complete and adequate safeguard to the public against those who breach its trust ÔÇö the opposite of trying to make it more difficult to oust such officers. And it is logically sound that those officials who *298 hold offices of public trust should be subject to closer scrutiny than private individuals whose crimes might not have such widespread effect. [at 599]
And further:
The object of the removal of a public officer for official misconduct is not to punish the officer, but to improve the public service. Public interest demands that public affairs be administered by officers upon whom rest no stigma of conviction of a felony, or of any offense involving a violation of their official duties. [Ibid.]
In a later case, State v. LaSota, 119 Ariz. 253, 580 P.2d 714 (1978), the Arizona Supreme Court recognized the difference between exclusion and expulsion when, notwithstanding their decision that impeachment as contained in the Constitution is not the exclusive method of removal, the court struck down as an unconstitutional added qualification that the Attorney General be a lawyer. But see Gangemi v. Rosengard, 44 N.J. 166, 171 (1965); Alongi v. Schatzman, 57 N.J. 564, 565, 575.
All of the major and minor premises upon which the Arizona court reached its conclusion have already been decided in New Jersey in the same way. Thus, the conclusion reached by this court must inescapably be the same as that reached in Arizona. As in Arizona, the legislative power has been vested by our Constitution in the Senate and General Assembly. N.J.Const. (1947), Art. IV,  I, par. 1. Just as in Arizona, the New Jersey Constitution, unlike the Federal Constitution, is not a grant but rather a limitation of power. State v. Murzda, Gangemi v. Berry, Smith v. Penta, all supra. Both the Attorney General in Arizona and Senator Musto in New Jersey are constitutional officers. Section 12-404 of the Arizona statute defining vacancies has the same effect as our forfeiture statute, N.J.S.A. 2C:51-2(a).
While it may be argued that under the Arizona Constitution the Attorney General is removed by impeachment, whereas under the N.J. Constitution a senator may be expelled by the Senate itself, N.J.Const. (1947), Art. IV,  IV, par. 3, this is an illusory difference. The Attorney General argues that a state senator is subject to impeachment under the Constitution. N.J. Const. (1947), Art. VII,  III, par. 1, states that

*299 The Governor and all other State officers, while in office and for two years thereafter, shall be liable to impeachment for misdemeanor committed during their respective continuance in office.
N.J.Const. (1947), Art. VII,  III, par. 3 provides:
Judgment in cases of impeachment shall not extend further than to removal from office, and to disqualification to hold and enjoy any public office of honor, profit or trust in this State; but the person convicted shall nevertheless be liable to indictment, trial and punishment according to law.
It is argued that under the Constitution of 1844 "the governor and all other civil officers" were liable to impeachment. N.J. Const. (1844), Art. V,  II. This reference to "civil officers" is similar to the Federal constitutional provision for impeachment found in U.S.Const., Art II,  4, which has been construed to exclude senators as civil officers. See Story, Commentaries on the Constitution,  793; Congressional Research Service, "The Constitution of the United States of America, Analysis and Interpretation," (Lib. of Cong. 1973), at 573. On an impeachment before the Senate in 1799 the question arose whether a senator was a civil officer within the purview of the Constitution of the United States, and the Senate decided he was not. Member of Congress 1882, 17 Atty.Gen'l Ops. 420. It is argued that the change in the Constitution of 1947 to "state officers" instead of "civil officers," as in the 1844 Constitution, reflects an intention by the framers of that Constitution to include senators as officers subject to impeachment.
An examination of the volumes of the Constitutional Convention of 1947 does not reveal any reason why the words "civil officers" were changed to "state officers." The Attorney General may be correct in his conclusion that the change was intended to include legislators as subject to impeachment. However, cases from other jurisdictions have held otherwise.
In State ex rel. Haviland v. Beadle, 42 Mont. 174, 111 P. 720 (1910), the court said:
[The Constitution] provides that the governor and other State and judicial officers shall be liable to impeachment, and if found guilty may be removed from office. The words "state officers" as therein employed, do not include members of the legislative assembly. Hiss v. Bartlett, 3 Gray (Mass.) 468, 63 Am.Dec. 768; 29 C.Y.C. 1414. Members of the legislative assembly are not liable *300 to impeachment. In re Speakership of House of Representatives, 15 Colo. 520, 25 P. 707, 11 L.R.A. 241.
And in Diffie v. Cowan, 56 S.W.2d 1097 (Tex.Civ.App. 1932), the court said:
It has long been held and accepted as settled law that a legislator is not a "civil officer", the speaker of a legislative assembly is not a "state officer" and members of state Legislatures are not "officers of the state" subject to impeachment and this will hold true even though the State Constitution may fail to expressly give the legislative body control over its own members. [at 1101]
It is interesting to note that Art. IV,  IV, par. 3, is permissive in its language in that it provides that "It [each House] may expel a member with a concurrence of two-thirds of all its members," whereas Art. VII,  III, par. 1, provides that the Governor and all other state officers while in office and for two years thereafter, "shall be liable to impeachment for misdemeanors committed during their respective continuance in office," with the Assembly having the sole power of impeachment by a vote of a majority of all the members, to be tried by the Senate and requiring two-thirds concurrence of all members of the Senate for conviction, Art. VII,  III, par. 2. There is a separate section for the impeachment of justices and judges in Art. VI,  VI, par. 4, and further provision for removal by the Supreme Court. Thus, the constitutional right in the Senate to expel a member is a permissive right, whereas other officers are mandatorily subject to impeachment. Since this is a permissive right, certainly it was within the province of the Legislature to exercise their right in other ways than that contained in the Constitution.
In any event, whether the removal of a senator be confined to the right to expel, as contained in Art. IV,  IV, par. 3, or also include impeachment under Art. VII,  3, par. 1 and 3, in either case the body to make that decision is the Senate and the vote must be by two-thirds of all the members of the Senate.
As further evidence that the Attorney General may be correct, it is noted that the impeachment section contains a specific provision, "but the person convicted shall nevertheless be liable to indictment, trial and punishment according to law," whereas *301 the section relating to expulsion of a legislator by the members of each house has no such provision. Could it be argued that a senator could not be prosecuted and convicted for criminal conduct on the theory of expressio unius est exclusius alterius? It seems quite evident that that was not the intent of the framers of the Constitution.
As stated by the court in Reilly v. Ozzard, supra:
An individual does not move beyond the restraints of law, common or statutory, when he accepts membership in the Legislature. He remains subject to them except insofar as they preclude acceptance of legislative office by one constitutionally qualified for it or impair performance of legislative duties. [33 N.J. at 536]
As Chief Justice Weintraub explained in In re Mattera, 34 N.J. 259 (1961):
A single act of misconduct may offend the public interest in a number of areas and call for an appropriate remedy as to each hurt. Thus it may require removal from public office. It may also require criminal prosecution. Still further it may require that the roster of attorneys be cleansed of a miscreant. The remedies are not cumulative to vindicate a single interest; rather each is designed to deal with a separate need. We can think of no reason why a prescription in the Constitution of a remedy for one purpose should be found to bespeak an intention to deny government the power to protect the public in its other interests or to immunize the offender from the further consequences his act would otherwise entail. [at 266]
While it is true that in Stothers v. Martini and Imbrie v. Marsh, both supra, the court based its conclusions on that maxim, expressio unius est exclusius alterius, from which one might conclude that the stated method of removal in the Constitution is an exclusive one, our later decisions make clear that this is not so, as set forth earlier. Therefore, just as the Arizona court concluded (188 P.2d at 597), "In such cases as the present, the maxim expressio unius est exclusius ulterius is not applicable and the Legislature may adopt any provision not prohibited by the Constitution." (But see Whitney v. Bolen, supra, where the Arizona court in striking down an unconstitutional added qualification for office cited the New Jersey case of Imbrie v. Marsh, which, as stated above, relied upon the maxim.)
There is support for the proposition advanced by Musto as to the exclusiveness of a constitutional provision for removal of *302 constitutional officers. See 67 C.J.S.  145 at 532, which provides:
Where the Constitution prescribes a mode for removing public officers, such mode usually is exclusive, and controlling, and the legislature may not authorize a removal in another mode.
And in the same volume, 67 C.J.S., Officers,  181 at 621:
The method provided by the constitution for the impeachment of public officers is exclusive and the power which the Legislature might otherwise be regarded as possessing is taken away.
But in the same volume the author says further, 67 C.J.S., Officers,  145 at 533:
While it has been held that a constitutional provision for the impeachment of certain public officers and their removal from office precludes the legislature from providing for the removal of such officers by other means, it has also been held that such a constitutional provision does not constitute, either directly or by implication, an exclusive remedy having the effect of prohibiting the legislature from devising supplemental methods of removal as in the case of an officer whose office is established by statute.
Musto cites In re N.J. State Bar Ass'n, 114 N.J. Eq. 261 (E. & A. 1933). However, that case dealt with the removal of judicial officers and concluded that the Chancellor did not possess power of removal. It did not deal with the Legislature. He also relies upon the language of the U.S. Supreme Court in Powell v. McCormack, supra, which, as stated above, was an exclusion rather than an expulsion case. Nonetheless, the court did extensively refer to the proposition that "the right of expulsion was too important to be exercised by a bare majority of a quorum," citing observations by James Madison and similar sentiments expressed by other famous leaders in our nation's history. But these remarks were made in the context of the Federal Constitution which, as has been repeatedly stated, is a grant of power, whereas the State Constitution is a limitation on power. Musto cites cases from other jurisdictions in support of his position, such as In re Investigation of Circuit Judge, 93 So.2d 601 (Fla. 1957) where the court said:
... Where the constitution creates an office, fixes its term and provides upon what conditions the incumbent may be removed before the expiration of his term it is beyond the power of the legislature or any authority to remove or suspend such officer in any manner than that provided by the constitution. [at 604]
*303 Similarly, he cites Laverty v. Cochran, 132 Neb. 118, 271 N.W. 354 (1937), and Robinson v. First Judicial Dist. Ct., 73 Nev. 169, 313 P.2d 436 (1957); Day v. Andrews, 279 Ala. 563, 188 So.2d 523 (1966).
It was acknowledged by the Arizona court in the Sullivan case, supra 188 P.2d at 597, that "Courts of last resort in several states with constitutions not dissimilar to ours have held that where the constitution provides for removal by impeachment that remedy is exclusive.", citing People v. Shawrer, 30 Wyo. 366, 222 P. 11 (Sup.Ct. 1923).
However, aside from the presumption of constitutionality which attaches to every statute, 2 Sutherland, Statutory Construction, (3 ed. 1943),  4509, the judiciary has a duty when confronted with alternative interpretations which are equally plausible to adopt the construction which avoids the constitutional issue and sustains the legislative enactment. Morss v. Forbes, 24 N.J. 341, 357 (1957). It must be remembered that the Legislature acted with existent constitutional law in mind and intended the act to function in a constitutional manner. State v. Profaci, 56 N.J. 346 (1970).
Therefore, just as the Arizona court concluded, "In such cases as the present, the maxim expressio unius est exclusius ulterius is not applicable and the Legislature may adopt any provision not prohibited by the Constitution," our Supreme Court in Reilly v. Ozzard, Gangemi v. Berry, and Smith v. Penta, all supra, concluded that the legal maxim that the express mention of one thing implies the exclusion of another is purely interpretative in aid of intention and not a rule of law. When applied to the Constitution, only those things expressed in such positive and affirmative terms so as to plainly imply the negative of what is not mentioned will be considered as limiting the power of the Legislature. In order to infer the exclusion of things not stated, the implication must be clear and compelling. For example, Art. IV,  VII, par. 1, "No divorce shall be granted by the Legislature." Clearly legislation which purported *304 to grant a divorce would be in violation of the Constitution. An implication of an exclusive method of removal of a state senator is in no way "clear and compelling."
An argument is made that the enactment of a statute, such as the forfeiture statute, may be by majority vote which would in effect enable the removal of a public officer with less than a two-thirds vote, as would be required in the case of expulsion or impeachment. This was an argument suggested in Powell v. McCormack, supra. However, as stated above, the Federal Constitution is a grant of power, whereas the State Constitution is a limitation of power.
The Senate, through its counsel, argues that rather than meeting a lesser constitutional requirement, as Musto argues (two-thirds for expulsion versus a majority for passage of a statute), the embodiment of a forfeiture provision in a statute carries greater weight because it follows a more difficult enactment procedure. If a member were to be removed pursuant to Art. IV,  IV, par. 3, it would be accomplished by a vote of two-thirds of all of the members of the Senate. On the other hand, to enact a statute, the majority of all of the members of both the State Senate and General Assembly must concur and the bill must then be signed into law by the governor or a veto overridden by two-thirds vote.
These additional steps and the additional deliberation provided by the coordinate branch of the Legislature as well as the Executive, certainly present a more difficult and arduous task than the expulsion procedure set forth in the Constitution which lies wholly within the Senate. Additionally, whereas when the Code of Criminal Justice was first enacted as chapter 95 of the Laws of 1978, by less than two-thirds vote in the Senate, the amendment by Senate Bill 1537, which became chapter 290 of the Laws of 1981, passed by a vote of 32 to 1. In both instances Senator Musto voted "aye."
The Senate makes the further argument that it has taken no action to disavow the provisions of N.J.S.A. 2C:51-2. In this *305 suit, as well as in the case of Errichetti v. Merlino, pending in the Law Division in Mercer County (Docket L-15319-81), the Senate has urged the court to find the statute constitutional. Further, by the issuance of its writ of election the Senate recognized a vacancy and implicitly determined that Musto, one of its members, had forfeited his office pursuant to N.J.S.A. 2C:51-2(a). Of course, this argument is insubstantial since it might be expected that a legislative body would urge the constitutionality of its own enactment, since one may presume that legislatures do not intend to act unconstitutionally.
Paraphrasing the Arizona Supreme Court, it is illogical to assume that expulsion or impeachment, provided by our Constitution, were intended by the framers of that document to be the exclusive methods for the removal of public officers. They serve as an added safeguard to the public against those officers who may be so powerful as to effectively avoid prosecution for wrongdoing. They could never have been intended to provide a shield for the corrupt official to prevent his removal by other means. On the contrary, full power has been vested in our Legislature by the Constitution. N.J.S.A. 2C:51-2 was enacted pursuant to that power.
The wording and history of our Constitution and forfeiture statute and common sense all dictate that the intent of both the framers of that Constitution and our Legislature (including Senator Musto by his affirmative votes) was to provide complete and adequate safeguards to the public against those who breach its trust ÔÇö the opposite of trying to make it more difficult to oust such officers. Public interest demands that public affairs be administered by officers upon whom rest no stigma of conviction of an offense involving dishonesty, crimes of the third degree or an offense touching upon his public office, position or employment.
For all of the foregoing reasons, it is the conclusion of this court that N.J.S.A. 2C:51-2 is constitutional and self-executing, to the end that upon his being sentenced by the United States *306 District Court on May 10, 1982, Musto forfeited his seat in the New Jersey State Senate. He is to forthwith vacate any facilities that may have been made available to him for his use as a state senator and to return any remuneration or other emolument of that office received by him since May 10, 1982.
The foregoing decision disposes of the suit by Musto against the Senate and its president. Accordingly, in that suit there will be a judgment in favor of the defendants and against the plaintiff. An appropriate order may be submitted by counsel for the Senate.

B. Present Office as Commissioner of the City of Union City
The City of Union City is governed by the commission form of government, as authorized by N.J.S.A. 40:70-1 et seq. The office of commissioner is established by N.J.S.A. 40:72-1. Musto was elected to that office for his present term in 1978, expiring on June 30, 1982. On May 11, 1982 he was re-elected to a new term commencing July 1, 1982, which circumstance will be dealt with under Point C. He was elected pursuant to N.J.S.A. 40:75-2, as amended by Chapter 379 of the Laws of 1981. Pursuant to N.J.S.A. 40:72-10 he has been chosen as mayor.
The duties and terms of office of commissioners are prescribed and defined by act of the Legislature. Lynch v. West New York, 115 N.J. Super. 1, 6 (App.Div. 1971). In Stothers v. Martini, 6 N.J. 560 (1951), the court said:
On the basis of the maxim expressio unius est exclusio alterius it has consistently been held that the legislature may not add to the qualifications fixed by the constitution for holders of constitutional offices, Imbrie v. Marsh, 3 N.J. 578, 585 (Sup.Ct. 1950); Anno. 47 A.L.R. 481. Conversely, it is the overwhelming weight of authority that the Legislature may prescribe qualifications for elective public office provided there is no constitutional provision on the subject and the exclusions from office are not arbitrary. 3 McQuillin, Municipal Corporations (3d Ed. 1949), 12.58, p. 232; 42 Am.Jur., Public Officers, 38 P. 909. [at 564]
Although the basis of the court's decision concerning constitutional officers is questionable, in light of the later cases dealing with the application of the maxim expressio unius est exclusio alterius as set forth under Point A above, there appears no *307 question as to the law with respect to statutory officers. See Clark v. DeFino, supra, 80 N.J. at 545.
In Struthers the Supreme Court upheld the constitutionality of N.J.S.A. 40:72-1, part of the same statute pursuant to which plaintiff holds his municipal office. The court pointed out that local municipal offices, including the office of commissioner, "are not provided by the Constitution and it is therefore silent as to the qualifications for such office. It is to be remembered that municipalities are mere agencies of the state and that the power of the Legislature over them is broad and well established." (80 N.J. at 563). The court observed that the right to vote guaranteed by the Constitution in Art. II, par. 3, is not coextensive with the right to hold office and therefore the electors may not vote for persons not qualified to hold office. The court concluded that the Legislature may constitutionally prescribe qualifications for elective municipal office. The decision in Stothers v. Martini was effectively overruled in the recent case of Matthews v. Atlantic City, 84 N.J. 153 (1980), which required the application of a more stringent standard of review to the particular statute in question, N.J.S.A. 40:72-1, as it relates to durational residency requirement. It restated the existence of legislative authority to prescribe qualifications for elected positions. It did not deal with the right of the Legislature to adopt a forfeiture statute relating to municipal offices.
There can be no question that the provisions for the forfeiture of public office contained in paragraph (a) of N.J.S.A. 2C:51-2 are applicable to Musto's present seat as commissioner and as mayor. In addition to the reasons spelled out under Section A with respect to forfeiture of his senate seat, in the case of his statutory office there is absolutely no question of the right of the Legislature to provide for the removal or forfeiture of that office. The predecessor statute, N.J.S.A. 2A:135-9, has been applied to municipal and county officers with no question as to its validity. See Hayes v. Hudson Cty. Freeholder Bd., supra. It is, of course, totally clear that a municipal office is a statutory office for which the qualifications may be fixed by the Legislature *308 and from which he may be removed for causes enunciated by the Legislature, as they have done in N.J.S.A. 2C:51-2(a).
Accordingly, there will be judgment in favor of the State of New Jersey and against defendant Musto declaring that he has forfeited his office as commissioner and mayor of the City of Union City as of May 10, 1982 upon his being sentenced in the United States District Court. Musto shall physically vacate any offices which have been assigned for his use as commissioner and mayor and shall forthwith refund any monies or other emoluments or remuneration received by him from May 10, 1982 until the present time.

C. Term as Commissioner of the City of Union City Commencing July 1, 1982
The question presented by the re-election of Musto on May 11, 1982 to his seat as commissioner of the City of Union City calls into play a separate section of N.J.S.A. 2C:51-2, i.e., (c) of that statute, which reads as follows:
In addition to the punishment prescribed for the offense, and the forfeiture set forth in 2C:51-2(a), any person convicted of an offense involving or touching on his public office, position or employment, shall be forever disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political sub-divisions.
This statutory provision is comparable to the constitutional provision dealing with the effect of impeachment, i.e., "and to disqualification to hold and enjoy any public office of honor, profit or trust in this State....". N.J.Const. (1947), Art. VII,  III, par. 3. It has long been recognized that the Legislature may, in the exercise of its broad power to legislate on the subject of criminal activities, enact laws which declare disqualification from public office as a consequence of conviction of certain crimes.
Under the Constitution of 1776, the legislative power was conferred upon the Assembly and the Legislative Council. Art. III of the 1776 Constitution stated, in part:
... The counties shall severally choose one person to be a member of the legislative council of this colony who shall be and have been, for one whole year *309 next before the election, an inhabitant and freeholder in the county in which he is chosen, and worth at least one thousand pounds, proclamation money, of real and personal estate within the same county....
While the Constitution of 1776 was a revolutionary document, adopted two days before the Declaration of Independence, under which the Legislature retained the power of amendment by statute, Imbrie v. Marsh, supra, 3 N.J. at 589-590, it is nonetheless significant that as early as 1829 the Legislature enacted "An Act for the Punishment of Crimes." Section 24 of that act dealing with the bribery of judges, concluded that the briber
... also shall forever be disqualified to hold any office of honor, trust or profit under this state. [Harrison, Laws of New Jersey, 227]
In chapter 235 of the Laws of 1898, various sections provided that the offender "be forever disqualified from holding any office of honor, trust or profit under this state". L. 1898, c. 235,  21 (judges),  25 (legislators),  28 (other officers).
In 1913 the Legislature supplemented the 1898 act and included therein a provision for the forfeiture of public office upon criminal conviction. L. 1913, c. 74. This ultimately became N.J.S.A. 2A:135-9 and the provisions disqualifying judges, legislators and other public officials from holding office ultimately became N.J.S.A. 2A:93-5. As stated above, both of these statutes were in full force and effect when the 1947 Constitution was adopted. Yet they were neither altered nor repealed, nor otherwise rendered without force by the new Constitution. Rather, the Constitution provided that they "shall remain in full force until they expire or are superceded, altered or repealed by this Constitution or otherwise." N.J.Const. (1947), Art. XI,  I, par. 3.
The Legislature's long-term adherence to this type of punishment for corrupt public officials and the fact that neither the 1844 nor the 1947 Constitution precluded the enactment of such statutory provision is of no small significance. In N.J. Ass'n on Corrections v. Lan, 80 N.J. 199 (1979), the court stated:
It is entitled to weight in analysis of the manner of application of the constitutional command. "Like all precedents, where contemporaneous and practical interpretation has stood unchallenged for a considerable length of time it will be *310 regarded as of great importance in arriving at the proper construction of the statute." 2A Sutherland, Statutes and Statutory Construction,  49.07, 251-52 (4th Ed. 1973). [Citations omitted]. This doctrine "has such prevalence that it is applicable not only in the exposition of statutes, but in the interpretation of constitutions of government." In re Hudson County, 106 N.J.L. 62, 75 (E. & A. 1928). [at 215, emphasis supplied].
N.J.S.A. 2A:135-9 and N.J.S.A. 2A:93-5 have been carried over into the new Code of Criminal Justice as N.J.S.A. 2C:51-2(a) and (c), the statute with which we are dealing.
All of the foregoing persuasively suggests that even if N.J.S.A. 2C:51-2(c) constitutes an added qualification for those seeking the office of State senator, as urged by Musto, it may still pass constitutional muster. However, as pointed out under Section 2A hereof, we are not concerned with the question of qualifications for the office of senator, since Musto has not been re-elected to that office. The court must confine itself to ruling upon what is before it. On the question of qualification for office we deal only with the office of commissioner of the City of Union City, which is not a constitutional office, but rather a statutory office.
Furthermore, we are not concerned with whether the offenses for which Musto has been convicted "involve or touch" his office as senator, but only as they relate to his office as commissioner and mayor. All of the charges concerning bribery and extortion and obtaining money under false pretenses, the underlying offenses described above, were offenses involving or touching his office as mayor and commissioner of the City of Union City.
As stated above in Section 2B, it is within the province of the Legislature to provide qualifications for elective municipal office. Stothers v. Martini, supra 6 N.J. at 567. It is true that in Matthews v. Atlantic City, supra, the Stothers decision was reviewed in light of more recent decisions of the United States Supreme Court as to the appropriate standard of review of a statute under the Equal Protection Clause of the U.S. Constitution. The court said:
With regard to the individual interests involved, we recognize that the right to be a candidate for office has never been held by either the United States *311 Supreme Court or this Court to enjoy "fundamental" status. Bullock v. Carter [405 U.S. 134, 92 S.Ct. 849, 31 L.Ed.2d 92], supra, Wurtzel v. Falcey, 69 N.J. 401 (1976). Nevertheless the relationship between the right to vote and the right to run for elective office can not be ignored. As Chief Justice Weintraub observed, "The right to vote would be empty indeed if it did not include the right of choice for whom to vote * * * In judging the validity of a restraint upon eligibility for elective office, we must be mindful that the restraint is upon the right to vote as well." (Gangemi v. Rosengard, 44 N.J. 166, 170 (1965)). [84 N.J. at 161]
The court acknowledged (at 162) the existence of legislative authority to prescribe minimum qualifications for elective positions being "as clear as the public's right to be the ultimate judge of fitness." In observing that there is no fundamental right to run for office and the importance of legislative interest in maintaining the integrity of the electoral process, the court said:
Protecting the integrity of the ballot is a valid government objective. See Bullock v. Carter, 405 U.S. [134] at 145, 92 Sup.Ct. [849] at 856, 31 L.Ed.2d [92] at 101; Jenness v. Fortson, 403 U.S. 431, 442, 91 Sup.Ct. 1970, 1976, 29 L.Ed.2d 554, 5562-563. The power to prescribe qualifications for State political office retained by the states under the Tenth Amendment, see Oregon v. Mitchell, 400 U.S. 112, 91 Sup.Ct. 260, 27 L.Ed.2d 272 (1970) is a permissible means by which to further this objective. The exercise of this power, however, remains subject to the requirements imposed on the States by other provisions of the federal constitution ÔÇö including the Equal Protection Clause. Turner v. Fouche, supra. [at 170]
The court examined the standards of review ranging from "strict scrutiny" to "the rational basis test." As Justice Clifford observed in his dissent, the majority resorted to an intermediate standard of review in place of the rational basis test used in Stothers, supra.
Musto observes that the statute applies to a narrow class, i.e., those public officers or employees who have been convicted of "an offense involving or touching on their public office, position or employment." In contrast, subsection (a) of the statute, providing for forfeiture of current office or employment, is applicable to all persons convicted of an offense involving dishonesty or of a crime of the third degree or above, as well as an offense involving or touching on such public office, position or employment. From this he argues that this narrow classification *312 cannot further a legitimate governmental interest and is thus arbitrary and capricious.
N.J.S.A. 2C:51-2 only deals with public officers. Subsection (a) requires forfeiture of a current office, whether or not the offense involves or touches upon the public office, if it involves dishonesty or a crime of the third degree. Obviously, it is a legitimate governmental objective to remove from public office someone convicted of a serious crime, on an offense involving dishonesty, even though it may be totally unrelated to his public office. In addition to the possibility of incarceration, parole or probation which would interfere with the necessary performance of public duties, it is appropriate for the Legislature to conclude that such person should not occupy a public office, position or employment.
However, if the offense is unrelated to the public office, position or employment, such person has not necessarily demonstrated a violation of the public trust bestowed upon him by election or appointment to the office, position or employment he occupies. On the other hand, a person convicted of an offense involving or touching upon his public office, position or employment has demonstrated such a violation of the public trust sufficient to warrant imposition of the added punishment by way of future disqualification. As pointed out by Justice Douglas in Williamson v. Lee Optical of Oklahoma, 348 U.S. 483, 75 S.Ct. 461, 99 L.Ed. 563 (1955):
The problem of legislative classification is a perennial one, admitting of no doctrinaire definition. Evils in the same field may be of different dimensions and proportions, requiring different remedies. Or so the legislature may think. Tigner v. State of Texas, 310 U.S. 141, 60 S.Ct. 879, 84 L.Ed. 1124. Or the reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind. Semler v. Oregon State Board of Dental Examiners, 294 U.S. 608, 55 S.Ct. 570, 79 L.Ed. 1086. The legislature may select one phase of one field and apply a remedy there, neglecting the others. A.F. of L. v. American Sash Co., 335 U.S. 538, 69 S.Ct. 258, 93 L.Ed. 222. The prohibition of the equal protection clause goes no further than the invidious discrimination. [at 489, 75 S.Ct. at 465]
Musto hypothesizes that if a police officer accepted $20 as a bribe for not issuing a traffic ticket to a motorist, he would be *313 forever barred from holding public office or employment. Yet, an individual who bribed a high state official in the sum of $100,000 would not be subject to disqualification under N.J.S.A. 2C:51-2(c). (If he bribed a legislator or certain other public officials, he would have been so disqualified under N.J.S.A. 2A:93-5, referring to 2 and 6. For some reason, in carrying this section into the Code of Criminal Justice in N.J.S.A. 2C:51-2(c), the relationship between N.J.S.A. 2A:93-5 and N.J.S.A. 2A:93-2 and 6 was not continued, although subsection (b) of N.J.S.A. 2A:93-5, as to ineligibility to submit bids, was carried into N.J.S.A. 2C:51-2 as subsection (d).)
Musto first suggests that the use of the word "offense" would include disorderly persons and petty disorderly persons offenses. The term "offense" is defined in N.J.S.A. 2C:1-14(k) as follows:
Offense means a crime, a disorderly persons offense, or a petty disorderly persons offense unless a particular section in this code is intended to apply to less than all three.
While it may be presumed that this definition is intended to apply to the word "offense" as used in N.J.S.A. 2C:51-2(a) and (c), see N.J.S.A. 2C:1-4(b) referring to the classification of disorderly persons and petty disorderly persons offenses. That section concludes: "Conviction of such offenses shall not give rise to any disability or legal disadvantage based on conviction of a crime." It isn't necessary for the court to construe this language, since Musto was not convicted of a disorderly or petty disorderly persons offense.
The hypothetical proffered by Musto has surface appeal, but it cannot withstand analysis. The bribery of a police officer is not a disorderly or petty disorderly persons offense, but rather a crime of the third degree. N.J.S.A. 2C:27-2(d) and N.J.S.A. 2C:27-6(e). As misconduct in office, the police officer would still commit a crime of the third degree. N.J.S.A. 2C:30-2(b). The $100,000 briber commits a crime of the second degree. N.J.S.A. 2C:27-2(d).
Assuming, however, that there is some disorderly persons or petty disorderly persons offense which would involve or touch *314 upon a public office, position or employment, there are many remedies available to such person. Perhaps an argument could be made that the statute is unconstitutional as applied to him. Clearly, this does not render the statute unconstitutional on its face. As applied to Musto it is certainly not unconstitutional. The offenses of which he was convicted were not disorderly persons or petty disorderly persons offenses, as noted in Section I above.
It appears to this court that it is a reasonable governmental objective to preclude those who have once violated the public trust from a second opportunity. It might also be a desirable governmental objective to bar those who induce public officials to prostitute their office, from themselves holding a public office, position or employment, as the 1829 act did as to bribers of judges and N.J.S.A. 2A:93-5 did as to bribers of legislators and other officials. However, it is not the function of the court to legislate, but only to review those acts of the Legislature against the background of the federal and state constitutions to ascertain their validity.
George Bernard Shaw is quoted as once having said:
It is much easier to write a good play than to make a good law. And there aren't 100 men in the world who can write a play good enough to stand the daily wear and tear as long as a law must.
It is to be borne in mind that this disqualification is an added punishment for the public official, "in addition to the punishment prescribed for the offense." Here, it is the State of New Jersey, punishing the errant public official for the offenses touching upon his public office for which he was convicted in the federal court. The Legislature has the right to prescribe penalties for criminal behavior, up to and including capital punishment. As our Supreme Court said in State v. Hampton, 61 N.J. 250 (1972):
The power to declare what shall be deemed a crime and to fix the maximum and minimum term of imprisonment for such a crime is committed by the people of the State to the legislative and not the judicial branch of government. The fact that the lawmakers provide more severe punishment for an offense than the courts approve, is no ground for judicial interference, unless it violates a *315 constitutional or other prohibition against such punishment. In dealing with the question courts consider whether the nature of the criticized punishment is such as to shock the general conscience and to violate principles of fundamental fairness; whether comparison shows the punishment to be grossly disproportionate to the offense, and whether the punishment goes beyond what is necessary to accomplish any legitimate penal aim. Absent such a showing the judiciary must respect the legislative will. [at 273]
The design of the range of penalties for crime is a legislative, not a judicial function. State v. Bausch, 171 N.J. Super. 314, 319 (App.Div. 1979). There has been no showing in this case that the additional punishment provided by the Legislature does not accomplish any legitimate penal aim or governmental objective. In fact, in addition to the prevention of proven corrupt officials from again holding office, the deterrence to other public officials may also accomplish an appropriate penal aim or governmental objective.
Musto argues as an additional basis for the unconstitutionality of N.J.S.A. 2C:51-2(c) that it establishes a conclusive presumption, i.e., that a public officer or employee, convicted of an offense involving or touching upon his public office or employment, will engage in the same behavior in the future, and is forever incapable of being rehabilitated to the point where he may again become a public servant. The United States Supreme Court held in Vlandis v. Klein, 412 U.S. 441, 446, 93 S.Ct. 2230, 2233, 37 L.Ed.2d 63 (1973), that statutes creating permanent irrebuttable presumptions have long been disfavored under the due process clauses of the fifth and fourteenth amendments. The court further held that a permanent and irrebuttable presumption violates due process when the presumption is not necessarily or universally true in fact. It is contended that subsection (c) of the statute creates such an irrebuttable presumption.
Musto points out that under N.J.S.A. 10:1-1 a citizen's right to hold office or employment is coextensive with the right to vote. N.J.S.A. 19:4-1(8) provides that the right to vote is suspended while a person is serving a sentence, or is on parole or probation as the result of conviction of an offense. From this *316 he concludes that the Legislature itself has recognized that a person convicted of an offense may become rehabilitated and fully participate in the political process. It follows from this, says Musto, that N.J.S.A. 2C:51-2(c) inconsistently establishes an irrebuttable presumption that the public officer will never become sufficiently rehabilitated to again hold public office.
First it must be observed that the conjunctive operation of N.J.S.A. 10:1-1 and N.J.S.A. 19:4-1(8) seemingly conflicts with the provision of N.J.S.A. 2C:51-2(c). Once the temporary ineligibility to vote created by N.J.S.A. 19:4-1(8) ends, that citizen would again have the right to vote and thus a coextensive right to hold office or employment pursuant to N.J.S.A. 10:1-1. The latter statute is a general act to insure civil rights without discrimination as to sex or marital status. N.J.S.A. 2C:51-1(c) is a specific statute which applies only to persons convicted of an offense involving or touching on his public office, position or employment, whereas N.J.S.A. 19:4-1(8) applies to persons convicted of any indictable offense. In the case of a conflict between a specific statute and a general statute the specific prevails. State v. Dilly, 48 N.J. 383, 387 (1967).
The difficulty in applying the irrebuttable presumption analysis is that, as a practical matter, "every rule of substantive law effecting a summary classification can be recast in terms of an irrebuttable presumption." Kirk v. Secretary of Health and Human Services, 667 F.2d 524, 533 (6th Cir.1981). It is important to note that most of the decisions on this subject have concerned activities which are more constitutionally protected than those in the present case. Of the cases cited by Musto, a majority have undertones of sex discrimination either against unwed mothers or pregnant women. These cases seem to require application of the strict scrutiny test, although this is not always clearly articulated. For example, in Vlandis one must examine the dissenting opinion of Chief Justice Burger to ascertain this ÔÇö "Distressingly, the court applies `strict scrutiny' and invalidates Connecticut's statutory scheme...." 412 U.S. at 460, 93 S.Ct. at 2240. In Matthews v. Atlantic City, supra, 84 *317 N.J. at 161, the court said: "We recognize that the right to be a candidate for office has never been held by either the United States Supreme Court or this Court to enjoy `fundamental' status." The cases relied upon by Musto involving irrebuttable presumptions all deal with rights which may be described as having "fundamental" status.
More recent cases have rejected the irrebuttable presumption theory, determining that a strict scrutiny test was not applicable where there exists no suspect classification. Kirk v. Secretary of Health and Human Services, supra. In MacDonald v. Bd. of Com'rs of Pilots, etc., 523 F. Supp. 949 (N.Y.D.Ct. 1981), the court said:
In any case, later Supreme Court decisions have made clear that some sort of suspect classification is necessary before a court can demand narrowly tailored alternatives to an irrebuttable presumption pursuant to strict scrutiny. [at 953]
The Court of Appeals, in Palmer v. Ticcione, 576 F.2d 459 (2d Cir.1978), cert. den. 440 U.S. 945, 99 S.Ct. 1421, 59 L.Ed.2d 633 (1979), stated at 468 that a statutory classification "sustainable as rationally based ... should not fall because it might also be labeled a presumption."
Applying the standard of judicial review required by Matthews v. Atlantic City, supra, the court concludes that N.J.S.A. 2C:51-2(c) does not violate the Equal Protection Clause of the United States Constitution. This conclusion is based on the extensive history in this State of imposing such permanent disqualification to hold any office of honor, trust or profit, on those convicted of offenses involving or touching upon their public office, as well as its inclusion in the 1947 Constitution of the State of New Jersey as to persons impeached. Rather than being unconstitutional, it represents a "requirement or restriction for candidates for elective public office, reasonably and suitably tailored to further legitimate governmental objectives," as well as an appropriate penal measure.
Lastly, Musto argues that, even if the statute is applicable, he is disqualified from "holding" any position of honor, trust or *318 profit, not of running and being elected to such. Thus, he contends that he should be permitted to be sworn into office as commissioner on July 1, 1982. Then, upon taking that oath, it is argued that N.J.S.A. 2C:51-2(c) would become effective. He reasons that if his conviction is ultimately reversed on appeal that he could then be restored to office. If he had not been sworn, such restoration would never be "feasible."
Initially it must be observed that the restoration to office provision of N.J.S.A. 2C:51-2(b)(2) does not apply to subsection (c). The latter is an added punishment for the offense by way of disqualification. If that conviction should be reversed on appeal, disqualification would end and he would again be qualified to hold such office or position of honor, trust or profit. However, at the time Musto was sentenced on May 10, 1982, he became disqualified. (It might even be argued that he became disqualified when the jury returned the guilty verdicts on March 26, 1982. See Local 1804 Longshoremen's Ass'n v. Waterfront Comm'n, 171 N.J. Super. 508, 511 (App.Div. 1979), aff'd 85 N.J. 606 (1981) where the court held: "New Jersey Courts have consistently held that a `conviction' occurs at the trial level when the court accepts a guilty plea or a jury returns a verdict of guilty.") In any event, both conviction and sentencing occurred before the election.
It is well established that the voters may not vote for a person not qualified to hold office. Stothers v. Martini, supra 6 N.J. at 565: "... votes cast for a deceased, disqualified or ineligible person, although ineffective to elect such person to office, are not to be treated as void or thrown away, but are to be counted in determining the result of the election as regards other candidates." (Emphasis added). 133 A.L.R. 319, Elections ÔÇö Dead or Disqualified Candidate, cited in In re Keogh-Dwyer, 106 N.J. Super. 567, 574 (Law Div. 1969), aff'd 54 N.J. 523 (1969). Thus, the votes cast for Musto on May 11, 1982 were ineffective to elect him to the office of commissioner and he never became a commissioner-elect.
*319 Whether he is sworn or not, a vacancy exists which must be filled. Someone will become the fifth commissioner. The citizens are entitled to have a full complement of commissioners to govern them. The vacancy will be filled pursuant to the Municipal Vacancy Law, N.J.S.A. 40A:16-1 et seq., if that applies.
Assume the conviction is reversed on appeal. Assume, further, that Musto successfully argues that the reversal relates back to the conviction and/or sentencing. Thus he was eligible to run. He was elected. Assume, further, that he can persuade a court that, under the doctrine of in pari materia, the restoration to office provisions of subsection (b) apply to subsection (c) of N.J.S.A. 2C:51-2. Even accepting all of these strained hypotheses, the result would be the same whether he is sworn on July 1, 1982 or not. Someone will be occupying the office whom he would have to displace. The act of being sworn would not aid in that displacement. Therefore, the court sees no useful purpose to be served in permitting Musto to be sworn on July 1, 1982, and in fact, specifically directs that he not be so sworn. It would be a charade.
The foregoing also answers Musto's argument that he was elected by the people whose will should prevail over that of the Legislature as expressed in the statutory enactment. While the people have "the right to select unworthy candidates, candidates whom the Legislature fear might bring ruin to the state" (Imbrie v. Marsh, supra, 5 N.J. at 245 (App.Div. 1949), aff'd 3 N.J. 578 (1950), as stated above, the voters have no right to vote for a disqualified candidate. Stothers v. Martini, supra.
Musto was apparently considered a competent legislator and well thought of among his colleagues in the Senate. A sufficient number of voters in Union City voted to elect him commissioner for a new term in spite of his trial and conviction and the attendant publicity. However, no one is above the law, no matter how powerful or popular. After his conviction the presumption of innocence was dispelled and he was required to forfeit his offices. He became disqualified to run for re-election *320 as an added punishment for those offenses. Thus he could not be re-elected.
We are a government of law, not of men. And the law must be enforced as the representatives of the people intended. Accordingly, there will be a judgment in favor of plaintiff, State of New Jersey, declaring that the provisions of N.J.S.A. 2C:51-2(c) apply to William V. Musto and he shall forever be disqualified from holding any office or position of honor, trust or profit under this State or any of its administrative or political subdivisions.